177 F.3d 394
 79 Fair Empl.Prac.Cas. (BNA) 1057
 Davine ALEXANDER, et al.,
Plaintiffs-Appellees/Cross-Appellants (96-3858),
v.
LOCAL 496, LABORERS' INTERNATIONAL UNION OF NORTH AMERICA;
Floyd Conrad, Defendants-Appellants
(96-3823/3854)/Cross-Appellees,
Laborers' International Union of North America,
Defendant-Appellant (96-3806/3857)/Cross-Appellee.
 Nos. 96-3806, 98-3823, 98-3854, 98-3857 and 98-3858.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 6, 1998.
Decided April 30, 1999.
Rehearing and Suggestion for Rehearing En Banc Denied June 30, 1999.
 
 Theodore T. Green (argued and briefed), Laborers' International Union of North America, Washington, D.C., Alan S. Belkin (argued and briefed), Law Offices of Alan S. Belkin, Cleveland, Ohio, Eben O. McNair, IV, Timothy J. Gallagher (briefed), Schwarzwald & Rock, Cleveland, Ohio, for Appellants.
 Edward G. Kramer (argued and briefed), KRAMER & NIERMANN, Cleveland, Ohio, Alan C. Rossman (argued and briefed), Schrieber, Rossman & Associates, Kenneth J. Kowalski, David G. Oakley (briefed), Kramer & Niermann, Cleveland, Ohio for Appellees.
 Before: KEITH, BATCHELDER, and COLE, Circuit Judges.
 COLE, J., delivered the opinion of the court, in which KEITH, J., joined. BATCHELDER, J. (pp. 414-29), delivered a separate opinion concurring in part and dissenting in part.
 OPINION
 COLE, Circuit Judge.
 
 
 1
 Defendants, Local Union 496, Laborers' International Union of North America ("Local 496"), Floyd Conrad, and Laborers' International Union of North America ("LIUNA"), appeal the district court's order finding them liable for race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and (c), and 42 U.S.C. § 1981.
 
 
 2
 Plaintiffs, all African-American persons who sought membership in Local 496 or referral for jobs at the Perry Nuclear Power Plant ("Perry"), cross-appeal the district court's order calculating damages and its order sanctioning plaintiffs' counsel for alleged failure to comply with LIUNA's discovery requests.
 
 
 3
 For the following reasons, we AFFIRM the judgment of the district court with respect to the defendants' appeal and AFFIRM the judgment of the district court with respect to the plaintiffs' cross-appeal.I. BACKGROUND
 
 
 4
 The facts in this case implicate the relationship among the plaintiffs, Local 496, LIUNA, and Perry, where members of the plaintiff class sought employment. All plaintiffs, including the named plaintiff, Davine Alexander, were black applicants whom Local 496 rejected for membership.
 
 
 5
 Work began at Perry, which is located in Lake County, Ohio, in the early 1970s. In 1973, Local 496[1] signed a project labor agreement with the Cleveland Electric Illuminating Company, under which Local 496 was to act as the exclusive hiring hall for laborers at Perry during the plant's "construction phase," which lasted until 1985. During this time, Perry was the primary employer of laborers in Lake County. However, Perry by no means exclusively employed laborers who resided in Lake County; laborers from several neighboring counties also coveted work at the plant, in large measure because of the relatively high wages Perry contractors offered. Perry laborers earned approximately $14.00 per hour, compared to the average $6.66 an hour other workers, including those in professional occupations, earned in the same geographic area.
 
 
 6
 Local 496's membership has always been overwhelmingly white. For example, between 1980 and 1985 blacks comprised only between 2.88% and 3.59% of its total membership. During this same time period, the union accepted 54 new members, only one of whom was black.[2] African Americans who sought a referral to Perry from this union faced daunting opposition. According to the project labor agreement, Local 496 was to refer both union members and non-members for laborers' positions at Perry. It failed to do so. Furthermore, Local 496's constitution, which is the Uniform Local Constitution of the Laborers' International Union of North America, requires that a person seeking union membership first be employed as a laborer in Lake County. This "working-in-the-calling" rule requires non-members seeking induction into Local 496 to first secure work at a "union shop." Conversely, in the event that an individual secured such work, he or she was required to join the union within eight days of beginning employment. Essentially, then, the project labor agreement, which obligated Local 496 to treat members and non-members alike for the purposes of referrals, was to constitute a contractual waiver of the working-in-the-calling rule. Unfortunately for the plaintiffs, despite this waiver, union personnel selectively enforced the working-in-the-calling rule to effect the exclusion of black prospective members. Most markedly between 1975 and 1985, a period of rapid union growth, Local 496 regularly waived the working-in-the-calling requirement for white applicants. The union declined to accord African-American applicants the same benefit. Indeed, Floyd Conrad, business manager of Local 496, admitted that the union failed to refer a single black non-member to Perry.
 
 
 7
 The white applicants for whom the union waived its working-in-the-calling rule were, more often than not, relatives of Local 496 members. During the relevant time period, over 30% of union members had relatives who were also union members. Moreover, one of the principal means of acquiring Local 496 membership or an employment referral from the union was the request of a relative or friend who was already a union member. Sometimes, union members asked the union's business manager for a waiver of the working-in-the-calling rule on behalf of their cronies. Alternately, union members working as stewards or foremen at Perry simply approached employers and contractors at the plant and recommended their relatives for available positions. This sort of direct access to Perry employers was only available to people already employed at the plant, because of the plant's security requirements.
 
 
 8
 The ease with which white members of Local 496 bolstered their ranks with friends and relatives contrasts starkly with the barriers their black counterparts confronted when they sought to act similarly. On several occasions, Donald Robinson, one of the few African-American members of Local 496, attempted to refer black friends and relatives to Conrad for positions at Perry. Conrad consistently ignored Robinson's requests. The story of Cheryl Journigan, a class member and relative of Donald Robinson's, illustrates Conrad's treatment of black applicants. Journigan testified that in 1985, she repeatedly sought union membership or employment referrals by calling and appearing at Local 496's union hall. Journigan recalled that Conrad invariably refused to return her telephone calls or instructed union secretaries to tell Journigan he was absent. Deborah Bracale, Conrad's secretary at the time, corroborated Journigan's account. At Conrad's direction, union personnel similarly rebuffed other African Americans seeking union membership or employment referrals. Thus, several factors, including nepotism, inequitable application of the working-in-the-calling-rule, and security at Perry, all converged to exclude black applicants from union membership and employment referrals.
 
 
 9
 After the plant's construction phase ended, maintenance work at the plant began. This work was performed pursuant to a 1985 National Maintenance Agreement, which LIUNA signed but Local 496 did not. However, the Maintenance Agreement provided that Local 496 was to act as LIUNA's agent in filling all laborer vacancies at Perry. No LIUNA representatives or agents were involved in administering the referral system.
 
 
 10
 After a decade of unsuccessful attempts to thwart the union's discriminatory membership restrictions, several black applicants initiated this class action in December 1984. Subsequently, by orders dated October 28, 1985 and March 6, 1986, individual discrimination suits filed by plaintiffs Ron Colvin, Richard Lilly, Edward Turner II, Percy Pouewells, Lee Coffee, Sr., Isiah Johnson, Jr., and Jimmie Rice, against Local 496 and Conrad were consolidated with the class suit. Cheryl Journigan, the last class member to file EEOC charges of discrimination against the defendants, did so on January 10, 1985. On January 26, 1988, the district court certified the class to include:
 
 
 11
 All Black persons who, on or before [January 26, 1988], have sought membership in Local 496 and/or employment either by application or by referral under the policy described in the collective bargaining agreement of March 9, 1973, by which the defendant union agreed to make referrals to employers at the Perry Nuclear Power Plant site.
 
 
 12
 LIUNA was aware of this action from its inception. Beginning in 1984, Business Agent Conrad regularly informed the regional office of LIUNA, specifically LIUNA's Regional Manager, Thomas J. Arconti, about charges lodged with the Equal Employment Opportunity Commission ("EEOC"), lawsuits filed by the plaintiffs, and of all findings of the EEOC related to the allegations against the local union. LIUNA's regional officers, the EEOC and the National Labor Relations Board, in turn, notified the General President of LIUNA of such events. In addition, the constitutions of Local 496 and LIUNA empowered LIUNA to intervene in the affairs of Local 496. Nevertheless, LIUNA never investigated the plaintiffs' charges of discrimination. Having discovered LIUNA's awareness of their EEOC charges against Local 496, in September 1989, plaintiffs Colvin and Tomblin filed additional EEOC charges against the parent union, claiming it intentionally refused to investigate the alleged discrimination. On January 12, 1990, the class moved to amend its complaint to add LIUNA as a defendant. Although the suit was originally to be tried on January 17, 1990, the district court found that LIUNA was an indispensable party and on January 19, 1990, accordingly granted the plaintiffs leave to amend their complaint. On January 22, 1990, Tomblin and Colvin filed amended EEOC charges of discrimination, again alleging that LIUNA had intentionally neglected to investigate their charges of discrimination against the other defendants. After Colvin received his EEOC right-to-sue letter, the plaintiffs filed their amended complaint, adding LIUNA as a defendant, on March 30, 1990.
 
 
 13
 After protracted preliminary proceedings, the plaintiffs had their day in court. The trial was bifurcated, first to determine the issue of liability, and then, if the district court found the defendants liable, to ascertain the amount of damages. A bench trial determining liability took place in the spring of 1991. On December 10, 1991, the district court found the defendants liable for both disparate treatment and disparate impact racial discrimination, in violation of Title VII and § 1981. Specifically, the district court found that as a result of the discriminatory application of its facially neutral membership requirements, Local 496 refused African Americans union membership in violation of federal civil rights law. The district court also determined that in order to deter black applicants and "keep Local 496 mainly an all white union[,]" African Americans applying for membership into Local 496 "were met with a reluctant or even, at times, hostile attitude of [Floyd Conrad]." In addition, the district court concluded that LIUNA was liable for Local 496's discriminatory practices because the local union acted as its parent's agent, and the international union breached its affirmative duty to ensure the local's compliance with federal civil rights law. During the damages trial in 1996, the parties reached a partial settlement. Local 496 agreed to an initial payment of $100,000, and LIUNA agreed to an initial payment of $200,000. The parties also agreed to a system by which Local 496 would give plaintiffs preference in employment referrals. Whether the plaintiffs receive any additional sum depends on the outcome of this appeal. Following a hearing, the district court approved the settlement in June 1996. This timely appeal followed.
 
 II. ANALYSIS
 A. Defendants' Appeal
 1. Disparate Treatment Liability
 
 14
 The defendants first argue that the district court erred in determining that they unlawfully subjected the plaintiffs to disparate treatment because of their race. This court reviews a district court's finding of facts made after a bench trial for clear error and reviews a district court's conclusions of law de novo. See Davies v. Centennial Life Ins. Co., 128 F.3d 934, 938 (6th Cir.1997). When reviewing for clear error, we must affirm the trial court unless we are left with the definite and firm conviction that a mistake has been committed. See EEOC v. Atlas Paper Box Co., 868 F.2d 1487, 1493 (6th Cir.1989) (citation and quotation omitted).
 
 
 15
 A plaintiff may create a presumption of discrimination pursuant to the McDonnell Douglas burden-shifting principle. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the McDonnell Douglas framework, a plaintiff bears the burden of establishing by a preponderance of the evidence a prima facie case and creating a presumption of discrimination by demonstrating: (1) membership in the protected class; (2) that he or she suffered from an adverse action; (3) that he or she was qualified for the position; and (4) that he or she was treated differently from similarly situated members of the unprotected class. See Mitchell v. Toledo Hosp., 964 F.2d 577, 582-83 (6th Cir.1992) (citing McDonnell Douglas, 411 U.S. at 803); see also Hartsel v. Keys, 87 F.3d 795, 800 (6th Cir.1996). Once the plaintiff establishes a prima facie case, a defendant may offer any legitimate, non-discriminatory reason for the action, which the plaintiff may then rebut with evidence of pretext; however, the burden of proof at all times remains with the plaintiff. Hartsel, 87 F.3d at 800. (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).
 
 
 16
 In this case, the district court found that pursuant to the McDonnell Douglas framework, the plaintiffs demonstrated that the defendants subjected them to racially based disparate treatment. First, the district court determined that the plaintiffs established a prima facie case by showing that: (1) they are black; (2) they were available for referral by the union for job opportunities at Perry; (3) Local 496 did not refer plaintiffs for employment opportunities at Perry; and (4) white non-union members were referred for work and made members of Local 496, during the same time plaintiffs had applied and been refused.
 
 
 17
 We agree. Floyd Conrad selectively enforced, to the detriment of black applicants, the Uniform Constitution's working-in-the-calling requirement. Conrad testified that white union members asked him "a thousand times or more" to admit unemployed relatives to Local 496, and that he obliged them; he also testified that he had admitted into the union his own unemployed relatives, including his father.[3] During the same time period, when Donald Robinson advised several unemployed African Americans to seek membership in Local 496, Conrad refused them all.[4] Moreover, at trial, Conrad admitted that whenever a contractor specifically requested that Local 496 refer a black person for employment, Conrad would call Local 860 of Cleveland, which had a higher percentage of African-American members than Local 496, to suggest that the Cleveland union refer one of its members. Conrad thereby avoided referring for employment, and subsequently admitting into Local 496, any African-American applicants.
 
 
 18
 Furthermore, African Americans suffered disparate treatment with regard to Local 496's Perry referral policy itself; after the union changed its Perry referral policy in 1987, it failed to make this change known to black applicants, effectively ensuring that they would not be referred. Prior to 1987, Local 496 did not have a written referral policy for Perry; however, it admits that it only referred members to Perry, in contravention of the project labor agreement. Local 496's practice was to allow members and, occasionally, non-members to sign a notebook located in the union indicating that they wished to be referred. Conrad would then compile a master list from the notebook containing the names of members only. This practice led to National Labor Relations Board charges against Local 496 and eventually to the written 1987 referral policy. Pursuant to the new policy, Local 496 maintained a single list of both members and non-members wishing to be referred to Perry. Local 496 made referrals from this list, in order. However, persons on the list were required to inform Local 496 monthly that they remained unemployed and interested in Perry. Otherwise, their names were removed from the referral list. Although this policy was facially neutral, Conrad did not inform class members of the new procedure. Members, however, were informed via posters hung in locations throughout the union hall to which only members had access. Consequently, class members' names were not retained on the union's referral list, and Local 496 never referred any for employment under this new policy.
 
 
 19
 For example, on or about January 22, 1990, plaintiffs Art Tomblin and Ronald Colvin appeared at Local 496's hiring hall seeking referral for employment. Pursuant to the October 1987 referral policy, the union representative asked Colvin and Tomblin to sign their names on the out-of-work list. They were 92nd and 93rd on the list at the time they signed up. On February 1, 1990, the union secretary prepared a new out-of-work list and deleted the names of the individuals on the January list who had received referrals for employment or had failed to notify Local 496 of their continued interest in a referral within the last thirty days. As a result of these deletions, Colvin and Tomblin advanced to positions 65 and 66 on the list. However, the union secretary responsible for preparation of the March 1990 out-of-work list dropped Colvin and Tomblin from the roster because they had failed to notify Local 496 of their continuing interest in referral for employment. According to the defendants, had Colvin and Tomblin indicated their continued interest, they would have remained on the roster and been referred for work in May of 1992. Moreover, the defendants argue that they informed plaintiffs' counsel of the new referral policy, and, thus, by association informed the plaintiffs.
 
 
 20
 Defendants suggest that Link v. Wabash R. Co., 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), supports their proposition that the knowledge of a litigant's counsel is imputed to the litigant. However, there are exceptions to this rule when, as here, equity requires such. See Partlow v. Jewish Orphans' Home of Southern Cal., 645 F.2d 757, 758-62 (9th Cir.1981). Quite frankly, we find it peculiar that although Local 496 supposedly implemented the new referral policy for the purpose of curing the previous policy's defects, the defendants never directly apprised African Americans seeking employment of the new referral system. Common sense dictates that if the defendants really intended to make employment opportunities available to all, they would have, as Magistrate Judge Hemann stated, "implemented this desire by making the new referral rules readily available and/or made at least one telephone call to prospective workers." This is particularly true given Conrad's admission that he failed to refer a single non-member minority to work at Perry. In this case, the defendants' notice to plaintiffs' counsel of the facially neutral referral system does not absolve defendants of their continued discriminatory application of that system. Thus, we decline to extend the holding of Link to this case.
 
 
 21
 Incidentally, the record contains still more evidence supporting the district court's conclusion that plaintiffs made out a prima facie case. Conrad, in fact, blatantly displayed his personal hostility toward African Americans on several occasions. Don Robinson and Rudy Bracale, another member of Local 496, both testified that Conrad referred to Robinson by a racial epithet on at least two occasions. See Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 354 (6th Cir.1998) (recognizing that discriminatory remarks of decisionmakers are relevant to show motivations for their actions); Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d 1241, 1248 (6th Cir.1995) (recognizing that employer's repeated use of racial epithets constituted direct evidence of racial discrimination). Furthermore, after Robinson began questioning Local 496's discriminatory practices, Conrad retaliated by removing Robinson from his position as union steward "because he was bringing up minority stuff that was not his business." Taken as a whole, we view the above as undeniable evidence of racial animus and disparate treatment and accordingly affirm the district court's conclusion that the plaintiffs established a prima facie case.
 
 
 22
 Once the plaintiff establishes a prima facie case of discrimination, the defendant may respond by articulating a legitimate, non-discriminatory reason for its action. Hartsel, 87 F.3d at 799. In this case, the defendants claim that the business purpose for their working-in-the-calling policy was to protect unemployed union members from an influx of unemployed non-members attempting to join the union. The district court found this reason to be pretext for discrimination, and the record supports the district court's conclusion. Quite simply, the defendants selectively enforced the working-in-the-calling requirement. As we have previously discussed, Conrad testified that he often admitted unemployed relatives of white union members. The fact that the defendants offered union membership to unemployed white non-members while they refused membership to African-Americans, even those who had been offered employment, plainly suggests that Conrad was less concerned with applicants' employment status than he was with their race. This evidence negates the defendants' proffered reason for refusing African-American applicants union membership, and the plaintiffs have thus met their burden of establishing pretext. See Manzer v. Diamond Shamrock Chemicals Co., 29 F.3d 1078, 1084 (6th Cir.1994) (recognizing that showing that the proffered reason did not actually motivate the defendant is sufficient to establish pretext).
 
 
 23
 The district court's conclusion with regard to disparate treatment was not clearly erroneous. To the contrary, we are hard-pressed to imagine a race-discrimination case with more explicit evidence of disparate treatment. We accordingly affirm the district court's conclusion that the defendants engaged in racially based disparate treatment in violation of Title VII.
 
 2. Disparate Impact Liability
 
 24
 The defendants argue that the district court erred in finding that the union's facially neutral policies had a disparate impact upon the plaintiffs, in violation of Title VII of the Civil Rights Act of 1964. The challenged practices are: (1) Local 496's working-in-the-calling rule; and (2) its practice of referring only union members for employment. The district court found that the plaintiffs presented statistical evidence sufficient to establish a prima facie case of disparate impact discrimination. The district court also determined that the defendants produced no job-related business justification for the policies engendering the disparate impact. We review a district court's finding of disparate impact discrimination for clear error. See Atlas Paper, 868 F.2d at 1493.
 
 
 25
 It is now well-settled that Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., proscribes both overt discrimination as well as "practices that are fair in form but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The plaintiff's burden in a Title VII disparate impact case is to prove that a particular employment practice has caused a significant adverse effect on a protected group. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); Scales, 925 F.2d at 908 (citing Watson v. Fort Worth Bank & Trust Co., 487 U.S. 977, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988)). Once the plaintiff establishes the adverse effect, the burden shifts to the employer to produce evidence that the challenged practice is a business necessity. See Wards Cove, 490 U.S. at 659.
 
 
 26
 Here, the defendants' principal argument is that the testimony of plaintiffs' expert, Brian Pendleton, Ph.D., was based on an overly broad labor pool and that as a result the district court erred in crediting his evidence over that of defense expert, Beth Martin, Ph.D. Dr. Pendleton based his statistics on a labor pool comprised of Lake, Ashtabula, Cuyahoga and Geauga Counties. The experts agreed that 93.5% of Local 496's membership came from these four counties. Dr. Pendleton's calculations led him to conclude that the percentage of African Americans in Local 496, approximately 5%, was two standard deviations lower than the percentage of African Americans in the four-county labor pool. Dr. Martin, on the other hand, based her statistics on a labor pool comprised only of the people employed in Lake County, where Perry is located. She narrowed her labor pool to this population based on her reasoning that Local 496's jurisdiction is limited to people employed in Lake County, regardless of their county of residence. Dr. Martin then determined that the percentage of African Americans in the relevant labor pool in Lake County and the number of black members of Local 496 both equaled 5%. Relying on this statistic, Dr. Martin reasoned that Local 496's African-American membership mirrored the African-American population in the relevant labor market and, on this basis, concluded that the union's policies had no disparate impact on the plaintiffs.
 
 
 27
 The district court found that the labor pool upon which Dr. Pendleton based his conclusion was overly broad, while Dr. Martin's was overly narrow. The district court nevertheless concluded that the "statistical disparities" were sufficient to establish a prima facie case of disparate impact discrimination. The district court reasoned that the union's membership and referral policies, characterized by the facially neutral working-in-the-calling rule and the policy of referring only union members for employment, "even if applied in a non-discriminatory fashion ... simply works to reinforce past patterns of discrimination."
 
 
 28
 We agree. As an initial matter, we note that despite whatever reservations the district court may have had with Dr. Pendleton's report, its determination of the "four-county area" as the correct labor pool was not clearly erroneous. The evidence in the record indicates that Perry paid extremely high wages for relatively low-skill positions. Therefore, applicants were exceedingly willing to commute from throughout the area to Perry. As the district court stated, then, "the gross disparity between the percentage of blacks in the membership of Local 496 and the four-county area" certainly supports a prima facie case. Moreover, we recognize that plaintiffs who present a statistical analysis of some challenged practice need not rule out all other variables to prevail. See United States v. City of Warren, 138 F.3d 1083, 1094 (6th Cir.1998) (citation omitted); see also Bazemore v. Friday, 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) ("A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather his or her burden is to prove discrimination by a preponderance of the evidence."). The fact that Local 496 maintained policies that limited the union's membership to people who were employed in Lake County, whose workforce was 99% white, necessarily had a disparate impact on unemployed African Americans seeking membership in, or employment referrals from, the union. Put differently, the overwhelming majority of workers eligible for union membership were white, in large measure because the union's own discriminatory practices prevented African Americans from obtaining employment in Lake County; Local 496's membership reflected this demographic, resulting in the de facto exclusion of African Americans from union membership. See Ingram v. Madison Square Garden, 709 F.2d 807, 810-11 (2d Cir.1983) (affirming district court's finding that union's referral policies violated Title VII based on a combination of a few statistics and evidence that behavior of union personnel discouraged plaintiffs from seeking employment); see also Gibson v. Local 40, Supercargoes and Checkers of the Int'l Longshoremen's and Warehousemen's Union, et al., 543 F.2d 1259, 1268 (9th Cir.1976) (stating that union's preference in referring relatives of union members when membership was overwhelmingly white had disparate impact in violation of Title VII even if defendants' nepotism was without discriminatory intent).
 
 
 29
 Once a plaintiff establishes that a particular practice has engendered a significant adverse effect, the defendant must produce evidence that the challenged practice is a business necessity. See Wards Cove, 490 U.S. at 659; Warren, 138 F.3d at 1091-92. Again, the defendants argue that their membership and referral policies, particularly the working-in-the-calling rule, were implemented to protect union members from competing for available positions with an influx of unemployed applicants. The district court correctly determined that this explanation does not justify the discriminatory effects of the challenged practices. Because, as explained above, Local 496 is the sole source of referrals for Perry and, in theory, it offered membership only to people employed in Lake County, its own practices served to reinforce the discriminatory impact on African Americans seeking employment at Perry, first by excluding them from union membership and then by refusing to refer them for jobs because they are non-members. Such a business justification, which buttresses established forms of discrimination, cannot withstand a Title VII challenge. See United States v. Bethlehem Steel Corp., 446 F.2d 652, 659 (2d Cir.1971) (holding that employer's facially neutral practices which perpetuated effects of employer's prior discrimination violated Title VII); see also Warren, 138 F.3d at 1094 (stating that defendant employer should not escape liability because it maintained two discriminatory practices which operated concurrently to exclude black applicants); Gibson, 543 F.2d at 1267 (invalidating practice that operated to freeze the status quo of the defendant's discriminatory employment practices).
 
 
 30
 Based on the evidence in the record, the district court correctly concluded that the plaintiffs established a prima facie disparate impact claim, and the defendants' proffered justification was pretext for discrimination. We therefore affirm the district court's finding of liability with regard to the plaintiffs' disparate impact claim.
 
 3. LIUNA's Liability
 
 31
 a. Statute of Limitations
 
 
 32
 LIUNA contends that the district court erred for a number of reasons by allowing plaintiffs' claims against it to proceed. First, LIUNA suggests that claims against it are barred by the statute of limitations governing Title VII claims.
 
 
 33
 Generally, the timely filing of a charge of discrimination with the EEOC is a condition precedent to a Title VII lawsuit. See Atlas Paper Box, 868 F.2d at 1495. Usually, if the alleged discrimination occurred more than 180 days prior to the plaintiff's filing of an EEOC charge, claims implicating these actions are barred. See id. However, if the alleged unlawful practice occurs in a "deferral state," in this case Ohio, which has enacted its own laws prohibiting discrimination in employment, the plaintiff must file suit within 300 days of the alleged discriminatory act. See 42 U.S.C.. § 2000e-5(e); EEOC v. Penton Indus. Pub. Co., 851 F.2d 835, 837 n. 5 (6th Cir.1988).
 
 
 34
 In this case, plaintiff Ronald Colvin first filed an EEOC charge against LIUNA on September 7, 1989. From this filing date, the 300-day statute of limitations applicable to Title VII actions filed in deferral states normally would preclude consideration of alleged violations occurring prior to November 11, 1988. Based on this chronology, LIUNA argues that none of the allegedly discriminatory acts occurring before this date supports a finding of liability against it. Because we conclude that the defendants, including LIUNA, are guilty of a continuing violation, as explained below, this argument is unavailing.
 
 
 35
 This court has long recognized that an ongoing, continuous series of discriminatory acts may be challenged if one of those discriminatory acts occurred within the limitations period. See, e.g., Haithcock v. Frank, 958 F.2d 671, 677 (6th Cir.1992); see also Dixon v. Anderson, 928 F.2d 212, 216 (6th Cir.1991). "If a continuing violation is shown, a plaintiff is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir.1996). We view continuing violations as falling into two categories of narrowly limited exceptions to the usual rule that statutes of limitations are triggered at the time the alleged discriminatory act occurred. See Haithcock, 958 F.2d at 677. The first category of continuing violations arises "where there is some evidence of present discriminatory activity giving rise to a claim of a continuing violation; that is where an employer continues presently to impose disparate work assignments or pay rates between similarly situated groups." Dixon, 928 F.2d at 216. However, "at least one of the forbidden discriminatory acts must have occurred within the relevant limitations period." Id. The second category of continuing violations arises "where there has occurred a longstanding and demonstrable policy of discrimination.... Unrelated incidents of discrimination will not suffice to invoke this exception; rather there must be a continuing over-arching policy of discrimination." Id. at 217 (internal quotations omitted).
 
 
 36
 The facts in this case clearly support the district court's conclusion that the defendants are liable regardless of the statute of limitations because their actions were part of a continuing violation. Floyd Conrad testified that over a significant period of time, he refused African Americans membership in Local 496 based on the working-in-the-calling rule. The district court found that this practice continued at least through January 1990. Also as late as January 1990, Local 496's personnel failed to apprise African-American non-members of the procedure necessary to maintain their eligibility for employment referrals, though the union's overwhelmingly white membership was informed of the relevant procedure. Further, Floyd Conrad's testimony supports a finding that although the official membership and referral policies of Local 496 may have changed over the years, the practice of excluding black applicants continued into the relevant limitations period. Moreover, the working-in-the-calling rule, memorialized in Local 496's constitution and by-laws, resulted in the de facto exclusion of African Americans from the ranks of Local 496 as well as from employment at Perry. Thus, the defendants committed both types of continuing violations recognized by this court: a series of related discriminatory acts and an established policy of discrimination.[5] See Haithcock, 958 F.2d at 678 (recognizing that a continuing violation exists where a policy of discrimination is longstanding and manifested in discriminatory treatment in more than one instance); see also Hull v. Cuyahoga Valley Joint Vocational Sch. District Bd. of Ed., 926 F.2d 505, 510-11 (6th Cir.1991) (stating that a complaint is timely filed and the continuing violation doctrine applies where a plaintiff challenges not just one incident of unlawful conduct but an unlawful practice that continues into the limitations period) (quotation omitted); see also United States v. International Assoc. of Bridge, Structural and Ornamental Iron Workers, Local No. 1, 438 F.2d 679, 683 (7th Cir.1971) ("[I]t is proper for a court to look at past discrimination to see whether an employer is perpetuating a pattern of discrimination through other means.... [T]he past sheds light on the present as well as the future. Past discrimination ... may be relevant to show motive and intent as to present practice or to establish a pattern or practice of discrimination or to show that present ... practices are designed to perpetuate or have the effect of perpetuating a past policy of discrimination.").
 
 
 37
 Local 496 has a despicable and egregious history of excluding African Americans from membership. We will not ignore this legacy of discrimination, paradigmatic of a continuing violation. To do so would be inequitable and unjust. Therefore, because the defendants' actions constitute a continuing violation, the district court correctly considered those actions which took place prior to the limitations period, as well as those that occurred within the limitations period. Accordingly, we affirm the judgment of the district court with regard to this issue.
 
 
 38
 b. Agency and Affirmative Duty Theories
 
 
 39
 LIUNA contends that the district court erred by finding it liable for the alleged racial discrimination of Local 496. The district court found that LIUNA was liable both because Local 496 was acting as the international union's agent and because LIUNA breached its affirmative duty to oppose Local 496's discriminatory practices by neglecting to remedy the alleged discrimination when it learned of the plaintiffs' claims. Again, we review these findings of fact for clear error. See Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1407 (D.C.Cir.1988).
 
 
 40
 Common law agency theories of vicarious liability govern the liability of international labor organizations for the acts of their local unions that violate Title VII and § 1981. See id. at 1427-28. At common law, a principal may be held liable for the intentional torts of its agent if the agent's conduct is within the scope of his agency and if, with the knowledge of the conditions, the principal intends the conduct or its consequences. See id. at 1430. In other words, in a case such as this, "a plaintiff must adduce specific evidence that the international 'instigated, supported, ratified, or encouraged' those actions, or 'that what was done was done by their agents in accordance with their fundamental agreement of association.' " Id. at 1427 (quoting Carbon Fuel v. United Mine Workers, 444 U.S. 212, 217-18, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979)). Furthermore, where an agency relationship exists, international unions are not only vicariously liable, they have an affirmative duty to oppose the local's discriminatory conduct. See Sinyard v. Foote & Davies Div. of McCall Corp., 577 F.2d 943, 945 (5th Cir.1978).[6] Thus, "[a]s a general proposition ... international labor unions must bear a heavy responsibility in giving effect to the remedial provisions of both Title VII" and § 1981. Id.
 
 
 41
 In this case, the district court correctly found that LIUNA is liable both vicariously and directly. LIUNA and Local 496 have clearly maintained a principal/agent relationship since March 1985 when LIUNA became a signatory to the National Maintenance Agreement, which included a provision stating that Local 496 was to fill all maintenance laborer positions at Perry.[7] However, the structure of the relationship between the local and the international was no different before this date, during Perry's construction phase. The working-in-the-calling requirement, which we have determined had a disparate impact on African Americans, was in fact a product of LIUNA's own Uniform Local Constitution. Article III, § 1(a) provides, "In order to be eligible for membership a person must be working in the calling within the territory of the Local Union in which the individual applies for membership." We are baffled and amazed as to how LIUNA can contend that it did not instigate, support, ratify, or encourage a policy that it created. Moreover, LIUNA was aware and on notice of the charges of discrimination filed against Local 496, as Floyd Conrad and the EEOC both informed LIUNA personnel of such developments. Thus the international cannot feign ignorance, and cannot be excused for breaching its duty to end Local 496's discrimination.[8] See Berger, 843 F.2d at 1428 ("Having ... approved a practice of the local that was later found to be discriminatory in effect, the international would surely have been held accountable for the local's conduct under the agency standard of the common law ...."); see also Sagers v. Yellow Freight System, Inc., 529 F.2d 721, 736, n. 32 (5th Cir.1976) (stating that international unions who are parties to national agreements have a duty under Section 1981 to inquire into the effect of contract provisions when it is reasonable to assume that such provisions might lead to discrimination, and that international unions have an affirmative obligation to protect members from agreements they help negotiate when such agreements "lock in" past discrimination).
 
 
 42
 Here, the district court's conclusion that LIUNA is liable is based on an eminently reasonable interpretation of the relationship between the international and local unions. Because the record and the applicable precedent support the district court's conclusion that LIUNA is liable for Local 496's discriminatory practices and policies, we affirm the judgment of the district court on this issue as well.
 
 4. Date of Accrual of Title VII Damages
 
 43
 Defendants contend that even if we affirm the district court's findings regarding liability, we should determine that the district court erred in determining the date upon which Title VII damages began to accrue against LIUNA. We review a district court's designation of the beginning of a back pay period for an abuse of discretion. See Warren, 138 F.3d at 1094.
 
 
 44
 Section 706(g) of Title VII, as amended in 1972, provides that "[b]ack pay liability shall not accrue from a date more than two years prior to the filing of a charge with the [Equal Employment Opportunity] Commission." 42 U.S.C. § 2000e-5(g). Plaintiffs did not file an EEOC charge against LIUNA until September 7, 1989, and thus defendants argue that their Title VII liability did not accrue until September 7, 1987. However, the first plaintiff to file an EEOC charge against Local 496 did so on February 1, 1984. The district court, citing Romain v. Kurek, 836 F.2d 241 (6th Cir.1987), determined that back pay liability against LIUNA commenced more than two years before this earlier date, on February 1, 1982.[9]
 
 
 45
 Romain outlines the conditions under which an unnamed party may be sued pursuant to the EEOC right-to-sue letter that results from an EEOC charge. "[A] party must be named in the EEOC charge before that party may be sued under Title VII unless there is a clear identity of interest between the unnamed party and a party named in the EEOC charge." Id. at 245 (internal quotes omitted). In Romain, this court adopted two tests for determining whether a party shares an identity of interest with another party. Under the first, set forth by the Seventh Circuit in Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130, 657 F.2d 890 (7th Cir.1981), an identity of interest exists when the unnamed party possesses sufficient notice of the claim to participate in voluntary conciliation proceedings. Romain, 836 F.2d at 245 ("Courts generally find an identity of interest where the unnamed party has been provided adequate notice of the charge under circumstances which afford him an opportunity to participate in conciliation proceedings aimed at voluntary compliance."). The second, developed by the Third Circuit in Glus v. G.C. Murphy Co., 562 F.2d 880 (3rd Cir.1977), uses four factors to determine the relationship between the named and the unnamed parties at the time the charge was filed:
 
 
 46
 (1) [W]hether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint;
 
 
 47
 (2) [W]hether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings;
 
 
 48
 (3) [W]hether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party;
 
 
 49
 (4) [W]hether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.
 
 
 50
 Romain, 836 F.2d at 246. As might be expected, because we have found LIUNA vicariously liable for Local 496's discriminatory practices and directly liable for violating its duty to stop those practices, under either test LIUNA and Local 496 share an identity of interest.
 
 
 51
 With regard to the Eggleston test, LIUNA certainly had ample notice of the charges the plaintiffs filed against Local 496. Floyd Conrad notified regional LIUNA officials who then informed national LIUNA personnel of all charges and relevant EEOC findings in this case. In addition, the EEOC and NLRB directly provided LIUNA with copies of all charges alleging discrimination by Local 496. LIUNA enjoyed supervisory power to interfere in the affairs of Local 496 and chose not to exercise that power despite the ongoing charges of discrimination. In light of this fact, the district court's finding that LIUNA had been provided with adequate notice affording it an opportunity to participate in, or at least encourage the other defendants to participate in, conciliation proceedings is not an abuse of discretion.
 
 
 52
 With regard to the Glus multi-factor test, we add the following. First, the plaintiffs were unaware of LIUNA's involvement in the affairs of Local 496 until well after the filing of the original EEOC charge; moreover, one could hardly expect those excluded from union membership to understand the relationship between international and local unions at the time they filed EEOC charges. Cf. Romain, 836 F.2d at 245 ("The 'identity of interest' exception acknowledges the reality that laymen, unassisted by trained lawyers, initiate the process of filing a charge with the EEOC, and accordingly prevents frustration of the remedial goals of Title VII by not requiring procedural exactness in stating the charge."). Second, the interests of LIUNA and the local were identical in terms of achieving voluntary conciliation with the plaintiffs during EEOC proceedings. Third, LIUNA was aware of the EEOC proceedings and thus was not prejudiced by the plaintiffs' failure to name it in the original EEOC charge.[10]
 
 
 53
 Therefore, under the Glus test, as under the Eggleston test, we conclude that LIUNA and Local 496 shared an identity of interest.
 
 
 54
 Because of this identity of interest, LIUNA could have been sued under the plaintiffs' first EEOC charge. Accordingly, then, the plaintiffs' second EEOC charge was not needed and we will not limit plaintiffs' Title VII damages by the date of this second, unnecessary charge. The Second Circuit reached a similar conclusion in Cornwell v. Robinson, 23 F.3d 694 (2nd Cir.1994). Cornwell, like the plaintiffs in this case, was the victim of a pattern and practice of discrimination. Her original EEOC charge and her original complaint, both filed in 1986, named her employer and a few others. Both failed, however, to name the individual employees who had been harassing her. In June 1986, she filed a second EEOC charge naming those employees for incidents that took place the year after she filed her original charges. She eventually received a right-to-sue letter against those employees, but did not actually file a Title VII claim against them until 1992. After concluding that the incidents in 1986 were part of the same pattern and practice of discrimination that Cornwell had endured for several years, and thus were naturally "reasonably related" to the discrimination that she had complained of in her original EEOC charge, the Second Circuit concluded that Cornwell's claim against the employees was not time barred, despite the fact that Title VII requires plaintiffs to sue within 90 days of the receipt of a right-to-sue letter. The court concluded:we can see no basis in Title VII or in reason for concluding that the agency's response to her unnecessary administrative claim imposed on her time constraints to which she would not have been subject had she not filed the unnecessary claim. A contrary, "technical" reading of a remedial statute such as Title VII would be particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.
 
 
 55
 Id. at 706. We agree. Thus, we conclude that the district court did not abuse its discretion by determining that the parent union's liability began to accrue at the same time as the local union's liability on February 1, 1982, and we affirm the judgment of the district court with regard to this issue.
 
 B. Plaintiffs' Cross-Appeal
 1. Date of Termination of Damages
 
 56
 The plaintiffs argue that the district court erred in establishing January 15, 1992 as the termination date of damages. The plaintiffs suggest that the district court should have adopted the magistrate judge's recommendation that damages terminate on the date that final judgment in the case is entered. We review a district court's order establishing the termination date of damages for an abuse of discretion. See Thornton v. East Texas Motor Freight, 497 F.2d 416, 422 (6th Cir.1974).
 
 
 57
 In this case, the district court declined to adopt the magistrate judge's recommendation that the termination date for damages coincide with the final judgment date. The district court reasoned that:
 
 
 58
 The [order regarding liability] found [Local 496's] referral policy adopted in October 1987 to be 'facially objective and non-discriminatory.' With that finding, injunctive relief and job opportunities were available to the class following the liability decision. On January 15, 1992, attorneys for the class were in a position to request injunctive relief regarding future referrals. There is no good reason to allow damages beyond January 15, 1992.... The ending date for all damages is January 15, 1992.
 
 
 59
 The district court's conclusion was not based on an erroneous finding of fact or an incorrect application of the law. Thus, it was not an abuse of discretion. See Warren, 138 F.3d at 1095; see also Thornton, 497 F.2d at 416 (concluding that district court's order establishing termination date of back pay relief in job discrimination case on date the employer changed its discriminatory policy rather than the date when the court made the final award of damages was not an abuse of discretion). We accordingly affirm the judgment of the district court with regard to this issue.[11]
 
 2. Sanction of Plaintiffs' Counsel
 
 60
 Plaintiffs contend that the district court erred by sanctioning their attorney for alleged misconduct pertaining to LIUNA's discovery requests. We review a district court's imposition of sanctions on attorneys for an abuse of discretion. See Palmer v. United States, 146 F.3d 361, 363 (6th Cir.1998) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990)). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." Id.
 
 
 61
 As Magistrate Judge Hemann stated, the history of the discovery disputes that took place during the damages phase of this action "need not be repeated here. Suffice it to say that [Judge Hemann] spent considerable time dealing with defendants' complaints about plaintiffs' failures to provide in some cases any, and in most cases all, requested discovery." With regard to these complaints, LIUNA filed a motion to dismiss forty-four members of the plaintiff class. In opposing LIUNA's motion, all except six of the plaintiffs cured the complained-of deficiencies. Judge Hemann therefore recommended that the district court deny LIUNA's motion to dismiss, noting the huge number of interrogatories defendants propounded. Judge Hemann went on to suggest specific action with regard to the six stragglers. She also suggested that the district assess, against all forty-four plaintiffs who were the subject of LIUNA's motion to dismiss, the attorneys' fees LIUNA incurred in filing the motion to dismiss. The district court adopted the report and recommendation, but ordered that plaintiffs' counsel, rather than the plaintiffs themselves, pay the attorneys' fees.
 
 
 62
 Nothing in the record leads us to believe that the district court misapplied the law or based its imposition of sanctions on a clearly erroneous assessment of the evidence. Therefore, we conclude that the district court did not abuse its discretion and affirm the imposition of sanctions on plaintiffs' counsel.
 
 III. CONCLUSION
 
 63
 For the foregoing reasons, with regard to the appeal, we AFFIRM the judgment of the district court in all respects. With regard to the cross-appeal, we also AFFIRM the judgment of the district court.
 
 CONCURRING IN PART, DISSENTING IN PART
 
 64
 ALICE M. BATCHELDER, Circuit Judge, concurring in part and dissenting in part.
 
 
 65
 For the reasons that follow, I would affirm the district court's finding of discriminatory impact, remand for further factual findings regarding discriminatory treatment, and reverse the district court's finding of liability against LIUNA. I concur in the majority's affirmance of the district court's imposition of discovery sanctions against the individual Plaintiffs and Plaintiffs' counsel.[1]
 
 
 66
 This case involves an employment discrimination class action suit filed on December 20, 1984, brought under 42 U.S.C.A. § 2000e, et seq. (West 1994 & Supp.1998) ("Title VII") and 42 U.S.C.A. § 1981 (West 1994 & Supp.1998). Originally named as defendants were Local 496 of the Laborer's International Union of North America ("Local 496") and a number of electric power companies that were later dismissed from the suit. By orders dated October 28, 1985, and March 6, 1986, individual discrimination suits filed by Plaintiffs Colvin; Lilly; Turner, II; Pouewells; Coffee, Sr.; Johnson, Jr.; and Rice against Local 496 and Local 496's Business Manager, Floyd Conrad,[2] were consolidated with the class suit.
 
 
 67
 On January 26, 1988, the court certified a class of
 
 
 68
 All Black persons who, on or before [January 26, 1988], have sought membership in Local 496 and/or employment either by application or by referral under the policy described in the collective bargaining agreement of March 9, 1973, by which the defendant union agreed to make referrals to employers at the Perry Nuclear Power Plant site.
 
 
 69
 Cheryl Journigan was the last class member to file an EEOC charge against Local 496; she filed on January 10, 1985. On September 7, 1989, Plaintiffs Colvin and Tomblin filed additional EEOC charges alleging that they had recently discovered that Laborer's International Union of North America ("LIUNA") was aware of their EEOC charges against Local 496 but had intentionally refused to investigate the matters; these were the first allegations in this case levied against LIUNA.
 
 
 70
 On January 12, 1990, the class moved to amend their complaint to add LIUNA as a party defendant. The suit originally was set for trial on January 17, 1990, but the trial court found that LIUNA was an indispensable party and on January 19, 1990, granted the Class leave to amend their complaint. On January 22, 1990, Plaintiffs Tomblin and Colvin filed "amended" charges of discrimination, again alleging that they had recently discovered that LIUNA had intentionally failed to investigate the discrimination charges. Colvin received his right to sue letter on March 26, 1990, and on March 30, 1990, the Class filed an amended complaint, adding LIUNA and Business Manager Conrad as party defendants.
 
 
 71
 The court bifurcated the liability and damages proceedings. After a 1991 trial on liability issues, on December 10, 1991, the district court found that Local 496 and Conrad had engaged in a pattern or practice of discriminatory treatment and were liable under a disparate impact theory, both in violation of Title VII and § 1981. The court also ruled that LIUNA was similarly liable because LIUNA had an agency relationship with Local 496 and because it had an affirmative duty to oppose its local affiliate's discrimination.
 
 
 72
 During the discovery period of the damages phase, the court imposed sanctions on five individual Plaintiffs and on Plaintiffs' counsel for failure to comply with LIUNA's discovery demands. During the damages portion of the trial, the parties reached a partial settlement wherein Local 496 and LIUNA agreed to make an initial payment to the Class; additional damages payments depend on the outcome of this appeal, and all parties reserved the right to appeal any order other than the judgment journalizing the settlement. The district court approved the parties' settlement agreement, and on July 19, 1996, the court formally dismissed the class action suit. All parties timely noticed their appeals.
 
 
 73
 Appellants Local 496 and LIUNA now claim that the trial court committed clear error in finding that Plaintiffs proved race discrimination under either a disparate impact or a disparate treatment theory. Appellant LIUNA also asserts that the trial court erred in finding that LIUNA was liable pursuant to either an "agency theory" or an "affirmative duty" theory. Plaintiffs cross-appeal, claiming that the district court abused its discretion in imposing sanctions against Plaintiffs and their counsel for discovery violations.
 
 
 74
 I. Factual Background.
 
 A.
 
 75
 In 1973, Local 496 signed a project labor agreement ("PLA" or "1973 agreement") governing the construction of the Perry Nuclear Power Plant ("Perry"), which is located in Lake County, Ohio. LIUNA was not a signatory to this agreement. In the absence of the PLA, LIUNA's Uniform Local Union Constitution, which governs Local 496, would require: "In order to be eligible for membership a person must be working at the calling within the territory of the Local Union in which the individual applies for membership." LUINA Uniform Local Constitution, Art. III, § 1(a). In other words, according to the Local Constitution, a nonmember must secure a union job before he or she is eligible to become a union member. If an individual obtained such a job, he or she was required to join Local 496 within eight days of beginning such employment.
 
 
 76
 The PLA, however, required in part that applicants for work on the Perry project be referred without regard to union membership.[3] Thus, the Perry contract essentially included a contractual waiver of the working-at-the-calling rule. Defendant Conrad admits that pursuant to this agreement, Local 496 operated as an "exclusive hiring hall" for laborers at Perry, and had an obligation to refer both members and non-members for the laborer jobs.
 
 
 77
 Perry's construction phase lasted from 1973 to 1985. Thereafter, work at Perry was considered "maintenance" and was performed under the National Maintenance Agreement, effective March 4, 1985. LIUNA signed the maintenance agreement; Local 496 did not. Local 496, however, continued as the referral agent for laborers at Perry.
 
 
 78
 Local 496's union hall is located in Madison, Ohio, and its geographical jurisdiction is limited to Lake County. Lake County is bordered to the east by Ashtabula County, to the south by Geauga County, to the west by Cuyahoga County, and to the north by Lake Erie. Local 496's craft jurisdiction is limited to commercial and industrial building construction. When Perry's owners first began to build Perry, a jurisdictional dispute arose between Local 496 and LIUNA Local 860, whose craft jurisdiction is "heavy construction," which includes roads, sewers, site preparations, bridges, dams, and airport runways, and whose geographic jurisdiction includes Lake, Cuyahoga, and Geauga counties. LIUNA resolved this dispute by splitting the work between the two Locals. Local 496, however, remained the exclusive referral source for laborers at Perry. As the Business Manager, Defendant Conrad personally had exclusive control over union referrals to all Perry contractors.
 
 B.
 
 79
 Local 496's membership is overwhelmingly white. Between 1980 and 1985, the total number of active members ranged from 509 to 545, while the number of black members ranged from 16 to 20. During this same period, black members comprised between 2.88% and 3.59% of total membership. Approximately 30% (145 of 507) of Local 496 members were related to one another. Between April 1982 and February 1984, 42 new members, none of whom was black, were initiated into the Local 496. From 1980 to 1985, the union accepted a total of 54 new members, one of whom was black.
 
 
 80
 Over the years, the referral practices of Local 496 have varied. Prior to October 1987, the union did not have in place a written referral policy. Local 496 admits that in response to contractor requests during the pre-1987 period, the union referred only members, in contravention of the PLA. Unemployed members could sign a spiral notebook located in the union hall, and from that notebook, Conrad would compile a master list of unemployed members from which he made referrals. At most times, non-members could also sign the notebook, but they were not included on the master referral list. During this period, Local 496 accepted as new members those who obtained contractor-letters or were hired directly by contractors.
 
 
 81
 In 1987, however, as part of a settlement of an NLRB charge filed by a white non-member, Local 496 instituted a new, written, referral policy. Under this policy, both members and nonmembers could sign the unemployed list, and referrals were to be made in the order that the names appeared on the list. Each month, the secretary was to prepare a new master list, deleting the names of individuals from the prior month's list who either (1) had worked more than 40 hours the prior month, or (2) had not contacted the union during the prior month and informed the union that he or she was still unemployed and was still interested in staying on the list. Plaintiffs' counsel, Edward Kramer, received a copy of these rules on August 30, 1989.
 
 
 82
 Even with the changed referral policy, the union admitted that it never actually referred a non-member to a job at Perry.[4] With one exception, however, after May 1985, no class member communicated with Local 496 for the purpose of becoming a union member and/or seeking a referral. Sometime between January 19 and 22, 1990, Plaintiffs Colvin and Tomblin went to Local 496's hall and signed the unemployed list. At the time of signing, their names were 92nd and 93rd on the list. While they were at the hall, no one informed Colvin or Tomblin about the monthly re-notification requirement.[5] Colvin and Tomblin testified that Mr. Harrington, a union representative, did tell them that to join the union, one must be working at the calling. On February 1, 1990, Local 496's secretary prepared a new unemployed list on which Colvin and Tomblin occupied the 65th and 67th positions. Neither Colvin nor Tomblin wrote or otherwise informed Local 496 during February 1990 or thereafter that he remained unemployed and continued to be interested in referrals. When the secretary prepared the March 1990 list, she removed Colvin and Thomas's names.
 
 C.
 
 83
 LIUNA and Local 496 are separate entities; the locals negotiate their own contracts, spend their own funds, own their own property, etc. At all relevant times, the Local 496 referral system was administered solely by Local 496. The constitutions of LIUNA and Local 496, however, provide LIUNA with supervisory power over Local 496. LIUNA retained the power to suspend or dissolve the charter of Local 496, and testimony established that LIUNA had the authority to correct "blatantly" discriminatory policies of local affiliates.
 
 
 84
 The district court found that LIUNA "has continually refused to investigate charges of discrimination or take any action to correct [Local 496's] illegal conduct." Local 496 frequently notified LIUNA of the race discrimination complaints that had been lodged against it, and LIUNA kept a file of documents pertaining to the discrimination claims. No class member, however, ever contacted LIUNA regarding a discrimination complaint. In an interrogatory answer, LIUNA stated that it never investigated the specific discrimination complaints lodged with the EEOC by Colvin and Tomblin in 1984 against Local 496, but that it instead mailed copies of the complaints to Thomas Arconti, LIUNA's Regional Manager in charge of Local 496. It also stated that this was consistent with LIUNA's established practice upon receipt of similar complaints, and cross-references its answers to earlier interrogatories.[6]
 
 
 85
 The evidence of record shows that several times in 1984 and 1985, Thomas Arconti met with Local 496 members, a number of whom were black, to discuss problems they were having getting referrals from Local 496. Also at that time, they discussed the discrimination complaints of a non-class member, Donald Robinson. Thomas Arconti died on May 1, 1989, prior to the filing of discrimination charges against LIUNA either with the EEOC or in the Amended Complaint; it is not clear from the record what his investigation disclosed.
 
 
 86
 II. Racial Discrimination.
 
 
 87
 Appellants Local 496 and LIUNA assert that the trial court committed clear error in finding that the Plaintiffs proved race discrimination under either a disparate impact or a disparate treatment theory. While I concur in the majority's conclusion that we must uphold the district court's finding of disparate impact, I believe that we cannot affirm the findings of disparate treatment because the dearth of relevant factual findings leave us unable to evaluate properly the court's finding of discriminatory treatment.[7]
 
 
 88
 We review a district court's factual finding of discrimination only for clear error. Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 374 (6th Cir.1984). Thus, findings with regard to the evidence necessary to establish a prima facie case of employment discrimination are reviewed under the clearly erroneous standard. See id. at 374-77.
 
 
 89
 Title VII prohibits discrimination by a union against its members on the basis of race, color, religion, sex, or national origin. 42 U.S.C.A. § 2000e-2(c). Racial discrimination is also prohibited by 42 U.S.C.A. § 1981; claims brought under § 1981 are governed by the same evidentiary framework applied to Title VII claims. Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).
 
 
 90
 In cases where plaintiffs allege that because of their race they were treated differently from Caucasian individuals, plaintiffs bear the initial burden of establishing by a preponderance of the evidence a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In these "disparate treatment" cases, plaintiffs must prove that the defendant had a discriminatory intent or motive, which in some situations may be inferred from the mere fact of differences in treatment. Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Plaintiffs may establish such intent either directly, by producing direct evidence of discrimination, or inferentially, by a showing of the following four elements: (1) plaintiffs belong to a protected class; (2) plaintiffs applied for and were qualified for employment; (3) despite their qualifications, plaintiffs were denied a favorable employment decision; and (4) persons outside of the protected class with substantially similar or lesser qualifications received the jobs. McDonnell Douglas, 411 U.S. at 802. Where plaintiffs allege a system-wide "pattern or practice" of discrimination, they must ultimately prove more than the mere occurrence of isolated or sporadic discriminatory acts; they must establish that racial discrimination was the defendant's "standard operating procedure." Teamsters, 431 U.S. at 336 & n. 16. Upon the plaintiffs' satisfaction of their prima facie case, the burden then shifts to the defendant to show a legitimate, nondiscriminatory business reason for acting as it did. If the defendant makes such a showing, the burden shifts back to the plaintiffs to show that the employer's stated reason is really a pretext for unlawful discrimination. Watson, 487 U.S. at 985-86.
 
 
 91
 Title VII proscribes "not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). In a so-called "disparate impact" case, the plaintiffs need not prove that the defendant intended to discriminate; instead, plaintiffs must prove that a particular employment practice, although neutral on its face, has caused a disproportionate adverse effect on a protected group. See Wards Cove Packing Co. v. Atonio, 490 U.S. 642, 657, 109 S.Ct. 2115, 2125, 104 L.Ed.2d 733 (1989); United States v. City of Warren, 138 F.3d 1083, 1091 (6th Cir.1998); Scales v. J.C. Bradford & Co., 925 F.2d 901, 907 (6th Cir.1991). Once the plaintiffs have established the adverse effect, the burden shifts to the employer to produce evidence that the challenged practice is a business necessity. Wards Cove, 490 U.S. at 658-59. The plaintiffs can defeat a defendant's asserted business justification by showing either that the justification is a pretext, or that there exists an alternative practice with less racial impact that will achieve the same business end. Id. at 658.
 
 
 92
 Evidence of disparate impact usually focuses on statistical disparities rather than on specific incidents. Watson, 487 U.S. at 987. We have frequently stated that to prove a prima facie case of disparate impact, plaintiffs must (1) identify a specific employment practice; and (2) "show an adverse effect caused by the employment practice by offering 'statistical evidence of a kind or degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs ... because of their membership in a protected group.' " Scales, 925 F.2d at 908 (quoting Watson, 487 U.S. at 994); see also City of Warren, 138 F.3d at 1093.
 
 
 93
 We have also held, however, that "statistical evidence is not absolutely essential in proving a disparate impact case[; nonetheless,] there must be proof of disparity using the proper standards for comparison." Gibson v. Frank, 946 F.2d 1229, 1233 (6th Cir.1991); see also Thomas v. Washington County Sch. Bd., 915 F.2d 922, 926 (4th Cir.1990) (statistics are "neither the exclusive nor a necessary means of proof" in disparate impact cases). The Supreme Court has made clear that the proper comparison in a disparate-impact case is between " 'the racial composition of [the at-issue jobs] and the racial composition of the qualified ... population in the relevant labor market.' " Wards Cove, 490 U.S. at 650 (alterations in original) (quoting Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 308, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)).
 
 
 94
 A. Disparate Impact.
 
 
 95
 The district court found that Plaintiffs established a prima facie case of discrimination under a disparate impact theory. Plaintiffs identified the members-only referral policy and the imposition of the working-at-the-calling requirement, in spite of its waiver in the PLA, as the employment practices causing the adverse effect. Plaintiffs asserted that in conjunction with these practices, two different types of "nepotism" operated to exclude blacks from jobs at Perry: (1) members who were already working at Perry could approach a contractor to get a relative or friend a union job; (2) members would approach Conrad to get relatives or friends employment.
 
 
 96
 Both sides submitted statistical analyses and expert testimony purporting to show that black membership in Local 496 was or was not proportionally low in a statistically significant way. While the experts agreed on the appropriate technique, i.e., standard deviation analysis, they disagreed upon how to define the relevant qualified labor force to which Local 496's membership must be compared.
 
 
 97
 The disagreement was primarily geographical. The experts agreed that the court should look at the numbers associated with both the General Occupational Category ("GOC") of "operators, fabricators and laborers," which included machine operators and tenders (except precision), fabricators, assemblers, inspectors and samplers, transportation occupations, material moving equipment operators, handlers, equipment cleaners, helpers, and laborers, and the Specific Occupational Category ("SOC") of "handlers, equipment cleaners, helpers, and laborers." They disagreed, however, on which persons falling under these categories should be included in the relevant labor force pool.
 
 
 98
 According to the 1980 Census, the residency figures in the four counties from which Local 496 drew 93.5%[8] of its members broke down as follows:
 
 
 99
 As an initial matter, I note that the parties stipulated that "1762 persons employed in [the SOC] Category in Cuyahoga, Lake, Ashtabula and Geauga counties were black." Despite the stipulation, I think that this number is obviously incorrect. Both experts purported to rely on statistics gathered from the 1980 Census. For the stipulated number to be accurate, the 1980 Census numbers for Cuyahoga County alone would be wrong, as would the resulting percentages. There is no support whatever in the record for this number, and the parties have not used it in their calculations. Thus, I too have ignored it. In addition, I note that the district court found that 23.4% of the SOC workforce in Cuyahoga, Lake, Ashtabula, and Geauga counties was black. That percentage figure does not appear in either party's calculations and does not find any support in the record. The court did, however, expressly claim to rely on the 1980 Census figures for this information. Therefore, I have used the number actually reported by the 1980 Census, i.e., 21.54%, as the comparison figure adopted by the court.
 
 
 100
 Plaintiffs' expert, Dr. Pendleton, opined that the relevant labor force numbers should be drawn from the entire four-county area. His opinion was based on several factors: (1) 93.5% of Local 496's membership lived in these four counties; (2) the pay scale (approximately $14.00/hr for Perry laborers vs. an average of $6.66/hr for all jobs, including professional occupations) and the relatively low skill-level required to perform the job necessitated consideration of an expanded geographic area because people would be willing to travel farther; and (3) the extensive highway system between Cuyahoga and Lake counties increased the distance which people would be willing to travel for work.[9] Dr. Pendleton testified that he did not "weight" his figures according to commuter patterns/population proportionality because there was evidence of a "chilling effect," i.e., when there has been either word-of-mouth recruiting or media coverage of past discrimination suits, both of which were present in this case, potential applicants remove themselves from the applicant pool and therefore skew the weights. Applying standard deviation analysis, Dr. Pendleton found that there was a statistically significant underrepresentation of blacks in Local 496's union membership.[10]
 
 
 101
 Defendant's expert, Dr. Martin, opined that the relevant labor force numbers should instead include only those individuals within the GOC or SOC who presently work in Lake County, regardless of residency. She based this opinion on the fact that Local 496's membership policy states that one must be working in Lake County at the time one applies for membership.[11] Using the applicant pool so-defined, Dr. Martin concluded that there was not a statistical underrepresentation of blacks in Local 496's membership.
 
 
 102
 Local 496 contends on appeal that the district court's finding of disparate impact cannot stand because the court failed to identify properly the relevant labor market. Wards Cove makes clear that defining the relevant labor force is of paramount importance. 490 U.S. at 650-51. This determination, however, is a factual question, which we review only for clear error. See EEOC v. O & G Spring & Wire Forms Specialty Co., 38 F.3d 872, 876-78 (7th Cir.1994). We have previously described "clear error" as
 
 
 103
 when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. The question is not whether the finding is the best or only conclusion that can be drawn from the evidence, or whether it is the one which the reviewing court would draw. Rather, the test is whether there is evidence in the record to support the lower court's finding, and whether its construction of that evidence is a reasonable one.
 
 
 104
 Heights Community Congress v. Hilltop Realty, Inc., 774 F.2d 135, 140 (6th Cir.1985).
 
 
 105
 The district court defined the relevant labor pool as follows:
 
 
 106
 The relevant geographic area for purposes of comparison of the labor force with the membership of Local 496 is the four-county area from which the union draws the majority of its members, not only the county over which the local has jurisdiction.... The four-county area is comprised of Lake, Ashtabula, Cuyahoga and Geauga counties.
 
 The court then concluded:
 
 107
 Local 496's membership and referral policies have resulted in a disproportionately small percentage of black union members as compared to the relevant labor force. Plaintiffs' statistical evidence shows a gross disparity between the percentage of blacks in the membership of Local 496 and the labor force of the four-county area, both in terms of total number of members during the relevant period and in terms of the new members taken in during this period.[12]
 
 
 108
 The statistical disparities are sufficient to establish a prima facie case of discrimination under the disparate impact theory. In addition, other evidence of discriminatory treatment of class members supports the statistical evidence and together the evidence raises an inference of intentional discrimination.
 
 
 109
 After reviewing the evidence, I cannot say that the four-county area clearly is too broad a measurement. It is true that earlier in its factual findings, the court described Dr. Pendleton's definition of the relevant labor pool as "either the GOC or the SOC for the four-county area, rather than limited to the GOC or the SOC working in Lake County," and stated that "the basis of Dr. Pendleton's report is too broad." It thus appears that the court's statements concerning Dr. Pendleton's definition of the relevant market and its own definition of the relevant market are, on their faces, internally inconsistent. But looking at the opinion and the record as a whole, I conclude that they are not inconsistent in substance.[13]
 
 
 110
 The court explicitly rejected Dr. Martin's opinion that the relevant market should include only those who presently work in Lake County. I would agree that Dr. Martin's definition is entirely too narrow. In fact, it begs the question. As the district court observed:
 
 
 111
 The weakness of Dr. Martin's argument or conclusion is that it does not take into consideration the fact that there may be discrimination in the hiring of the 6,488 employees in the GOC in Lake County. In other words, if in the hiring of all of the 6,488 employees in the GOC in Lake County there was in fact discrimination, then 5% blacks would not be a proper figure. Dr. Martin's conclusion assumes that there was no discrimination in the hiring of blacks in the GOC and, thus, her conclusion that the applicant pool is 5% black may or may not be valid.
 
 
 112
 See Clark v. Chrysler Corp., 673 F.2d 921, 928 (7th Cir.1982) (recognizing that the danger of "weighting" a relevant labor market calculation to reflect commuter patterns is that the geographic recruiting and employment practices may themselves be tainted by racial discrimination). In addition, I see no reason to assume that persons currently driving to work in Cuyahoga, Ashtabula, or Geauga Counties would not be willing to drive an equal time or distance to work in Lake County if desired jobs were available. Moreover, Dr. Martin's definition relies on the existence of the working-at-the-calling requirement. Under the PLA between Perry and Local 496, however, persons not yet working in Lake County and persons not yet members of Local 496 can be referred to Perry and then admitted into membership. Thus, there is no factual basis for Dr. Martin's arbitrary limitation.
 
 
 113
 As listed above, Dr. Pendleton's testimony provided several reasons why the court should consider the population figures for all four counties, not the least of which was the relatively high wages that laborers at Perry earned. Compare EEOC v. Chicago Miniature Lamp Works, 947 F.2d 292, 302 (7th Cir.1991) (finding it necessary to consider commuting times because the jobs at issue paid low wages and provided little opportunity for advancement, and therefore were more likely to be filled by those living close by). I find these reasons persuasive and sufficient grounds for the court to include the entire four-county area in the relevant labor market.
 
 
 114
 Moreover, if it is appropriate to include in the relevant labor market the bordering Ashtabula and Geauga Counties, which Defendants do not contest, obviously at least some portion of the bordering Cuyahoga County must also be included. If, for proximity reasons, the court were to limit the portion of Cuyahoga County includable in the relevant labor market to something less than the entirety of Cuyahoga County, in all likelihood, black percentages would increase: the majority of Cuyahoga County's black population resides on the county's east side, i.e., the side located closer to Lake County and the Perry plant. See, e.g., United States v. City of Parma, 661 F.2d 562, 565-66 (6th Cir.1981); Banks v. Perk, 341 F.Supp. 1175, 1178 (N.D.Ohio 1972), aff'd in part, rev'd in part, 473 F.2d 910 (6th Cir.1973). Thus the court's definition of the relevant labor market was not clearly erroneous.[14]
 
 
 115
 As the court found, whether one compares the relevant labor market population percentage (SOC--21.54%; GOC--21.79%) to the Local 496's total black membership numbers (2.88%--3.59%) or to the number of new black members admitted during 1982-84(0%) or 1980-85 (approximately 2%), the disparity is statistically significant. Thus, despite the confusion as to numbers in the district court's opinion, I conclude that the court's finding of a "gross disparity between the percentage of blacks in the membership of Local 496 and the [relevant] labor force" was not clearly erroneous.
 
 
 116
 Local 496 further argues that the court failed properly to link the statistical disparity shown to the employment practices at issue. In addition to its statistical findings, however, the court cited considerable anecdotal evidence showing that these disparities were in fact caused by the members-only referral policy and the imposition of the working-at-the-calling rule. See Gibson, 946 F.2d at 1233 (a plaintiff may establish disparate impact on a racial minority without statistical evidence).
 
 
 117
 The court's list of evidence included: the bargaining agreements; that employers, by custom, practice and agreement, could hire employees without any union oversight regarding discrimination; that the union admitted into membership anyone whom an employer hired; that in 1975, union membership was 100 with 10 black members, while in 1985, membership was 500 with 20 black members; that Perry was a "closed shop" arrangement; that in response to non-specified employer requests for workers, the union sent only members and never sent a non-member; that because of security, the average applicant could not gain access to Perry employers to be hired, while present union members, stewards, and foremen had direct access to such employers and could recommend their relatives and friends to employers for jobs, thereby rendering these relatives and friends "working in the calling"; and that approximately 30% of all union members, and 30% of those hired at Perry, were relatives of existing union members. The court also found that when a contractor specifically asked for a minority worker, instead of sending one of the black non-member plaintiffs, Conrad would instead contact Local 860 to obtain a referral. In addition, as the court noted, Conrad essentially admitted that he knew that employers relied on their white, but not black, superintendents and foremen to acquire additional workers.
 
 
 118
 Given the extreme statistical disparity between the number of blacks in the relevant labor pool and the number of new black members added to Local 496 between 1980 and 1985, the district court did not clearly err in finding that this disparity was caused by Local 496's members-only referral policy and the working-at-the-calling rule. Perry is a closed shop. Local 496 admittedly referred only members to Perry during the time period in question. To become a member of Local 496, one had to be working-at-the-calling in Lake County, but during the time in question, Perry was the primary employer of laborers in all of Lake County. Also during the relevant period, all of the class members approached the union, requested membership and/or referrals to Perry, and were denied the same. It is therefore reasonable to conclude that the challenged practices caused the statistical disparity. Consequently, I agree that this court must affirm the district court's finding of disparate impact.[15]
 
 
 119
 B. Disparate Treatment.
 
 
 120
 The district court held that Plaintiffs proved a prima facie case of disparate treatment under the McDonnell Douglas test because: (1) plaintiffs are black; (2) they were available for referral by the union for job opportunities at Perry; (3) they did not receive referrals despite the fact that as nonmembers, they should have been referred according to the PLA; and (4) white non-members were referred to jobs to which plaintiffs had applied and were made members of Local 496. The court also summarily stated that the evidence demonstrated that Local 496 failed to inform minorities of its procedures for membership and job referrals.
 
 
 121
 On appeal, Local 496 devotes considerable energy to attempting to discredit the court's conclusions that Local 496 referred white, but not black, non-members to jobs at Perry and that Local 496 failed to inform minorities, but informed white persons, about membership and referral procedures. Plaintiffs respond by pointing to evidence in the record that could support the court's conclusions. While there is evidence in the record that, if credited, might support the district court's findings, "[i]t has long been clear that when the court does not make findings which are sufficient to indicate the factual basis for its ultimate conclusion, the appropriate procedure is to vacate the judgment and remand for such findings." Gonzales v. Galvin, 151 F.3d 526, 532 (6th Cir.1998) (emphasis omitted); accord Deal v. Cincinnati Bd. of Educ., 11 Ohio Misc. 184, 369 F.2d 55, 63-64 (6th Cir.1966) (there must be subsidiary findings to support the ultimate conclusions of the court).
 
 
 122
 In its findings of fact, without further explanation, the district court summarily stated that the working-at-the-calling requirement was waived "primarily" for white applicants. The only expansion on this conclusory finding is the court's statement in its conclusions of law that "the evidence in the record shows a pattern and policy of favoritism to friends and relatives." The court fails to provide us with a single clue as to who these "friends and relatives" allegedly receiving favorable treatment were, or how, when, or how often the working-at-the-calling rule was waived in this manner, or for that matter, whether such waivers were racially disproportionate. Similarly, while the court did find that in 1990, black class members were not informed of the monthly renotification requirement, the evidence of record reflects only one instance where the union failed to provide a copy of its referral policy. The court failed to make any other findings with respect to the union's failure to provide membership/referral policy information. Thus, I do not believe that we can assess whether Local 496 maintained a "pattern and practice" of refusing to inform minorities of membership and referral procedures. Moreover, the court has not provided us with any reasons to support its implicit conclusion that white persons were given such information. We simply do not know what evidence the court credited in reaching its conclusion that Plaintiffs had been treated in a discriminatory manner.
 
 
 123
 [A] district court's findings "should be comprehensive and relevant to the issues so as to provide a rational basis for the trial court's decision." In addition, the "findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision."
 
 
 124
 Sanders v. Dorris, 873 F.2d 938, 942-43 (6th Cir.1989) (district court's failure to discuss evidence supporting pattern and practice discrimination) (quoting Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 792 (6th Cir.1984)) (internal citation omitted); see also Gonzales, 151 F.3d at 532. In short, due to the court's complete failure to make relevant factual findings, we cannot discern the grounds for its decision and we therefore have no basis upon which to determine whether its conclusions were clearly erroneous. Therefore, I would remand this issue to the district court to provide explicit factual findings explaining the basis for its conclusions.
 
 
 125
 III. Liability of LIUNA.
 
 
 126
 We review de novo a district court's conclusions of law, Waxman v. Luna, 881 F.2d 237, 240 (6th Cir.1989) (per curiam), but review its findings of fact only for clear error, Jackson v. RKO Bottlers of Toledo, Inc., 743 F.2d 370, 374 (6th Cir.1984).
 
 
 127
 The National Maintenance Agreement, signed by LIUNA and effective at Perry in March 1985, provided in part:
 
 
 128
 The employer agrees to hire men in any territory where work is being performed or is to be performed in accordance with the hiring procedure existing in the territory where the work is being performed or is performed; however, in the event the Local Union is unable to fill the request of the Employer for Employees within a forty-eight (48) hour period after such request for Employees ..., the Employer may employ workmen from any source.
 
 
 129
 The Agreement also contained a non-discrimination clause, which stated: "The Union and the Employer agree to abide by all Executive Orders and subsequent amendments thereto, regarding the Civil Rights Act of 1964, pertaining to non-discrimination in employment, in every respect."
 
 
 130
 The district court found that "[a]t all relevant times, the referral system was administered solely by Local 496; no International Union representative or agent has participated in its operation." The court also found that LIUNA "was aware of the discriminatory actions being take by the defendant[s] Local 496 and Floyd Conrad since May of 1983, but has continually refused to investigate charges of discrimination or take any action to correct this illegal conduct." It is undisputed, however, that no class member ever contacted LIUNA to register a discrimination complaint or to ask LIUNA to investigate his or her situation.
 
 
 131
 The district court concluded that LIUNA was liable under a principal-agent theory for the discriminatory actions of Local 496 because both before and after March 1985, LIUNA was "aware" of Local 496's actions regarding its refusal to make referrals to class members or to permit them to become union members, and because LIUNA "acquiesced" in those actions. The court also held that LIUNA had an affirmative duty under Title VII and § 1981 to oppose Local 496's discriminatory practices because for several years LIUNA had knowledge of the class members' charges of discrimination against Local 496 and of some resulting EEOC reasonable cause findings, and because LIUNA had signed the National Maintenance Agreement, which regulated labor relations at Perry.
 
 
 132
 A. Agency Theory.
 
 
 133
 An international union may be liable for the discriminatory practices of an affiliated local if, in carrying out such practices, the local is acting as the international's agent. See Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395, 1426-33 (D.C.Cir.1988).[16] Thus, to be liable under Title VII, an international must "participate in" or "authorize[ ], ratify[ ], or approve[ ]" of the particular condition about which the plaintiff complains. See id. at 1428-32.[17] Contrary to the statements of the district court, mere "acquiescence" is not enough. To be similarly liable under § 1981, the plaintiff must also prove that the relationship between the international and the local is sufficient to impute discriminatory intent. Id. at 1430.
 
 
 134
 In the present case, the district court's findings and the parties' stipulations foreclose a finding that LIUNA "participated in" the discriminatory referral process. The closer question, of course, is whether, by signing the National Maintenance Agreement, and therein obligating contractors to "hire men in any territory where work is being performed or is to be performed in accordance with the hiring procedure existing in the territory where the work is being performed or is to be performed," when LIUNA knew or should have known of Local 496's discriminatory practices, LIUNA "authorized, ratified, or approved" Local 496's referral practices.
 
 
 135
 In General Building Contractors, like in the present case, the plaintiffs charged that the union had engaged in a pattern and practice of racial discrimination by systematically denying access to union referral lists and by arbitrarily skewing referrals in favor of white workers. The Court held that the mere fact that trade associations and employers had delegated to the union the authority to select workers, and the union, in effectuating that delegation, intentionally discriminated or produced a discriminatory impact, alone was not enough to support an agency relationship. 458 U.S. at 391-94. Likewise, this court cannot find that merely securing in the National Maintenance Agreement a promise that the contractors will follow Local 496's hiring procedures, whatever they may be, without any concurrent control over those procedures, is sufficient to render LIUNA a principal responsible for Local 496's discriminatory actions. This is particularly so because the same agreement that Plaintiffs and the district court would read as reflecting LIUNA's acquiescence in the discriminatory referral procedures also contains an explicit requirement that the union not discriminate.
 
 
 136
 In Berger, the court found an agency relationship because, in addition to the international union's constitutional provisions providing the international with oversight authority over the local's membership practices (which alone would not be enough to find the agency relationship, 843 F.2d at 1431), the international had formally endorsed the establishment of the discriminatory practice in question and was actually involved in its implementation. Id. at 1430-32. In the cases cited by Plaintiffs, the provisions in question were themselves discriminatory and were explicitly negotiated by the international. See, e.g., Myers v. Gilman Paper Corp., 544 F.2d 837, 844, 847-48, 850-51 (5th Cir.1977) (agency liability for "line seniority" provision in labor agreement either negotiated by the international or "advised" by international and requiring international's approval). In the present case, LIUNA was not involved in Local 496's 1973 agreement to refer both members and non-members to laborer positions at Perry. Plaintiffs have failed to present any evidence indicating that LIUNA supported or approved of Local 496's decision in fact not to comply with the terms of the PLA, or allegedly to make exceptions in their noncompliance for a number of white relatives/friends. LIUNA knew that charges of discrimination had been levied, but not that discrimination actually had occurred, and knew that Plaintiffs were seeking court intervention to resolve the matter. Therefore, on the record before us, where the district court found and the record reflects nothing more than mere "acquiescence," in my view we cannot find that Local 496 was acting as LIUNA's agent when it discriminated against Plaintiffs.
 
 
 137
 B. Affirmative Duty Theory.
 
 
 138
 The district court found that because LIUNA had notice of discrimination complaints against Local 496 and because it was a party to the National Maintenance Agreement, LIUNA had an affirmative duty to oppose Local 496's discriminatory conduct. In so holding, the district court relied upon Kaplan v. International Alliance of Theatrical & Stage Employees, 525 F.2d 1354 (9th Cir.1975), wherein the Ninth Circuit held that under Title VII, "[b]y making and [tacitly] enforcing" a collective bargaining agreement that perpetuates past discriminatory effects, an international labor organizations has an affirmative duty to take corrective steps to prevent the perpetuation of such discrimination by their affiliates. Id. at 1360. Central to Kaplan 's holding, however, is that the international union actually negotiated on behalf of the local the agreement containing the discriminatory referral procedure. See id. at 1359-60. In contrast, LIUNA was not involved either in the negotiation of the 1973 PLA, or in Local 496's decision not to comply with the PLA's requirements. Moreover, in Kaplan, the provision perpetuating the discriminatory effects was part of the collective bargaining agreement itself. In the present case, Plaintiffs did not allege and the district court did not find that the PLA itself was discriminatory; it was the failure of Local 496 (by referring only members) and the employers (because of security at Perry) to properly implement the agreement that caused the discrimination.
 
 
 139
 Plaintiffs argue that requiring anything more than an international union's knowledge of discrimination claims against a local affiliate to create an affirmative duty would be "in direct conflict with the broad remedial purposes of Title VII and Section 1981, as well as LIUNA's duties under the National Maintenance Agreement." In General Building Contractors Association, however, the Supreme Court explicitly stated
 
 
 140
 [T]he question is not whether the employers and associations are free to delegate their duty to abide by § 1981, for whatever duty the statute imposes, they are bound to adhere to it. The question is what duty does § 1981 impose. More precisely, does § 1981 impose a duty to refrain from intentionally denying blacks the right to contract on the same basis as whites or does it impose an affirmative obligation to ensure that blacks enjoy such a right? The language of the statute does not speak in terms of duties. It merely declares specific rights held by "[a]ll persons within the jurisdiction of the United States." We are confident that the Thirty-ninth Congress meant to do no more than prohibit the employers and associations in these cases from intentionally depriving black workers of the rights enumerated in the statute, including the equal right to contract. It did not intend to make them the guarantors of the workers' rights as against third parties who would infringe them.
 
 
 141
 458 U.S. at 396 (second emphasis added). Thus, at least under § 1981, in the absence of an agency relationship, an international union does not have an affirmative duty to ensure that its affiliates do not undertake discriminatory practices. See also Goodman v. Lukens Steel Co., 482 U.S. 656, 687-89, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987) (Powell, concurring);[18] cf. Phelan v. Local 305 of United Ass'n of Journeymen, 973 F.2d 1050, 1061 (2d Cir.1992) (in context of union democracy claim, citing Carbon Fuel for the proposition that: "An international union has no independent duty to intervene in the affairs of its local chapters, even where the international has knowledge of the local's unlawful acts."). Because of the close relationship between Title VII and § 1981, I conclude that the same standard applies in the Title VII context. See Berger, 843 F.2d at 1429 (noting that an international's liability for the actions of an affiliate must be based on something "more than the abstract and unbounded premise that the entities regulated by [Title VII and § 1981] have an 'affirmative duty' to end discrimination."). The non-discrimination clause of the National Maintenance Agreement likewise does not require anything greater.
 
 
 142
 Moreover, as a practical matter, holding LIUNA responsible for Local 496's actions, under the facts of this case, makes little sense. In finding an affirmative duty, the district court relied in part on the fact that in March 1985, LIUNA signed the National Maintenance Agreement. Before 1985, LIUNA was not a party to any Perry agreement. After May 1985, no class member even applied for union membership until 1990. During that period, no class member filed an EEOC grievance claiming additional discrimination. In addition, no class member ever requested that LIUNA investigate the charges of discrimination. As far as LIUNA was aware, the institution of the October 1987 referral policy, which the court acknowledged appeared to be neutral on its face, corrected any discrimination problems that had appeared in the past.
 
 
 143
 For the foregoing reasons, I would hold that the district court erred in finding that LIUNA had an affirmative duty to oppose Local 496's discriminatory practices.[19]
 
 
 
 [1]
 Through its parent, LIUNA, Local 496 is a member of the AFL-CIO. Local 496's jurisdiction is limited to building and construction work in Lake County, Ohio
 
 
 [2]
 Furthermore, between 1975 and 1979, Local 496's membership increased by more than 500%. During the same time, black membership increased from approximately 12 members to 18 members. Between April 1982 and February 1984, 42 new members joined Local 496, none of whom was black
 
 
 [3]
 Additional white relatives of union members whom Conrad admitted to the union although they were not then "working in the calling" include: Donald Crofoot's son-in-law, David Yankee; Randy Isarelli's uncle, Thomas Isarelli; David Russka; Robert Mackey; Thomas Schroeder; James Vechery, Jr.; Robert Lohman; Donald Patton; Mickey Fisher; and two sons of Local 496's Field Representative, Rudy Bracale
 
 
 [4]
 Defendants contend that they did, in fact, waive the working-in-the-calling requirement for several African Americans. The record demonstrates that this is not the case. Two of those that the defendants claimed they waived the requirement for were already members of another union. The union constitution allows persons to freely transfer between unions. The remaining individuals had either obtained employment that was to begin once they were admitted to the union or had obtained letters indicating that they would be considered for employment once they were admitted to the union. The record indicates that the union considered such people working in the calling. The defendants point to no unemployed black non-member who was admitted to the union
 
 
 [5]
 Although exact dates are difficult to ascertain from the record, it appears that most of the class members approached Local 496 in the early and mid-1980s. Nevertheless, the record as a whole supports the conclusion that the defendants maintained racially discriminatory policies and practices well into the limitations period. In any event, the evidence certainly does not leave us with a definite and firm conviction that the district court committed a mistake in finding the defendants liable for a continuing violation. Therefore, we determine that the district court's finding was not clearly erroneous with regard to this issue. See Atlas Paper Box, 868 F.2d at 1493
 
 
 [6]
 The Fifth Circuit has held that an international union is liable for a local's discrimination where a "sufficient connection" existed between the international and the local. See Myers v. Gilman Paper Corp., 544 F.2d 837, 851 (5th Cir.1977). The D.C. Circuit determined that the Myers "sufficient connection" test was not meaningfully different from common-law agency principles. See Berger, 843 F.2d at 1428. We agree
 
 
 [7]
 The dissent reaches a different conclusion, relying on General Bldg. Contractors Ass'n v. Pennsylvania, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). Although that case did indeed involve a hiring hall and a claim of vicarious liability, it is distinguishable. The question there was whether an employer could be held liable for the discrimination of a union, obviously a very different question from the one at hand. "In the run of cases, the relationship between an employer and the union that represents its employees cannot be accurately characterized as one between principal and agent or master and servant. Indeed, such a conception is alien to the fundamental assumptions upon which the federal labor laws are structured." Id. at 393. The theoretical underpinnings of the National Labor Relations Act do not compel a similar result here. To the contrary, it would be alien not to find an agency relationship when an international union signed a contract stating that the local--not the international--would provide workers for the employer
 
 
 [8]
 The dissent's recognition that LIUNA attempted to explain its failure to investigate the plaintiffs' charges of discrimination as "consistent with LIUNA's established practice upon receipt of similar complaints" begs the question whether the international's "established practice" was sufficient under the circumstances. According to LIUNA's answers to the plaintiffs' interrogatories, it customarily referred charges of discrimination against locals to the relevant regional manager, in this instance Arconti. Arconti died in 1989, prior to the addition of LIUNA as a defendant. However, between 1984, when the plaintiffs filed their first EEOC charge against Local 496, and 1989, Arconti never investigated Local 496's referral practices, much less sanctioned them. LIUNA conceded in its response to the interrogatories that it could not even verify whether Arconti ever met with representatives of Local 496 regarding the plaintiffs' charges. This leads us to wonder whether simply forwarding notice of charges of discrimination against a local union to the international's regional manager is an effective means of insuring the local's compliance with civil rights law. Moreover, we note that in this case the regional manager notified the national office of LIUNA of the charges in the first place. We cannot comprehend how simply circulating between LIUNA's national and regional offices notice of the same EEOC charges and complaints without subsequent investigation could sufficiently address the local's alleged racial discrimination. We question what incentive LIUNA's local unions have to comply with anti-discrimination statutes when they face no threat of sanction, or even investigation, by their parent union. Evidently, LIUNA's "established practice" was not incentive enough
 
 
 [9]
 In other words, the district court determined that back pay liability under Title VII commenced on the same day for both LIUNA and Local 496
 
 
 [10]
 The fourth Glus factor is immaterial on these facts. LIUNA neither represented that plaintiffs' relationship with it should or should not be through Local 496
 
 
 [11]
 Plaintiffs also challenge the accrual date of back pay against LIUNA under § 1981. Because of our conclusions with regard to the accrual of Title VII back pay against LIUNA, we decline to address this issue
 
 
 [1]
 LIUNA also claims that the district court erred in finding that discrimination occurred within the limitations period applicable to LIUNA and in holding LIUNA liable pursuant to a continuing violations theory. Plaintiffs also claim that the district court committed error in two of its damages rulings pertaining to LIUNA. Because I conclude that the district court erred in holding LIUNA liable, I would not address these issues
 
 
 [2]
 For ease of discussion, except where otherwise noted, we include Defendant Conrad in collective references to "Local 496."
 
 
 [3]
 The PLA was signed by representatives of Perry's owners and of all of the trades, including Local 496. The provision in question, Art. VIII, provides in pertinent part:
 Contractors performing construction work on the Perry Nuclear Power Plant project shall, in filling job vacancies, utilize the registration facilities and referral systems operated by the Local Unions in accordance with the provisions of applicable Federal and States laws.
 The selection of applicants for work on this project shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, bylaws, rules, regulations, constitutional provisions, or any other aspect of union membership, policies, or requirements.
 (emphasis added).
 The PLA was revised in March 1983, but the provisions regarding hiring of laborers remained unchanged.
 
 
 [4]
 In the settlement agreement, however, the parties stipulated that if he had been asked, Conrad would have testified that after the adoption of the 1987 referral rules, nonmembers who followed the policy "would" have been referred pursuant to the policy's written terms
 
 
 [5]
 Despite the fact that class counsel had a copy of the 1987 referral rules, he did not discuss the notification requirement or new referral rules with Colvin, Tomblin, or any other class member
 
 
 [6]
 In those interrogatories, LIUNA stated:
 During the period from January 1, 1982, to the date of production, defendant LIUNA has not formally investigated a claim of racial discrimination against a local affiliate. Customarily, upon receipt of letters from members which charge a local affiliate with racial discrimination or with some other misfeasance or nonfeasance, the General President refers the letters over to the appropriate regional manger. The regional manager, in turn, normally contacts all the parties involved in an attempt to resolve the matter informally.
 
 
 [7]
 Local 496 also asserts that the district court improperly found that Conrad was "individually" liable under Title VII. For the record, we note that the court did not make such an explicit determination, instead stating that "Local 496 and Floyd Conrad have engaged in a pattern or practice of discrimination which constitutes an unlawful employment practice in violation of 42 U.S.C. §§ 2000e-2(a), (c), and 42 U.S.C. § 1981." In any event, we agree with Local 496 that for the same reasons as stated in Wathen v. General Elec. Co., 115 F.3d 400 (6th Cir.1997), with respect to the liability of an "employer's" "agents," Conrad cannot be held personally liable under Title VII as the agent of a "labor organization." See id. at 403-06; cf. 42 U.S.C. § 2000e-2
 
 
 [8]
 The parties stipulated that as of April 1985, Local 496's members resided in the following counties: Lake--290 (54%); Ashtabula--125 (23.5%); Cuyahoga--49 (9.2%); Geauga--33 (6.2%); Other--34 (6.4%)
 General Labor Force GOC SOC
 Black Total Black Total Black Total
Lake 1,341 107,123 379 20,074 47 36,777
Ashtabula 1,179 45,989 420 12,150 149 2,143
Cuyahoga 144,573 710,029 34,972 126,295 7,821 30,219
Geauga 431 35,352 44 5,812 9 1,217
Total 147,524 898,493 35,815 164,331 8,026 37,256
 % Black 16.42% 21.79% 21.54%
 
 
 [9]
 Dr. Pendleton testified that because of the road systems, he used the population figures for all of Cuyahoga county; he acknowledged, however, that the majority of Cuyahoga County's black population resided in the county's eastern half, and noted that the Perry Plant was within 20 miles from the east-side
 
 
 [10]
 Between 1983 and 1985, the standard deviations for the SOC ranged from -9.77 to -10.36; the standard deviations for the GOC ranged from -9.88 to -10.46; the standard deviations for the total labor force ranged from -7.75 to -8.34. Any standard deviation number smaller than -2.00 (e.g. -2.5) constitutes a statistically significant underrepresentation, i.e., one where the probability that the resulting numbers occurred by chance is extremely small. See Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 309 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)
 
 
 [11]
 Dr. Martin found that there were a total of 6,488 workers in the GOC from the four-county area that work in Lake County, and that 358, or 5.5%, are black. There are 1,195 workers in the SOC from the four-county area who work in Lake County, and that 52, or 4.35%, are black. The overall workforce in Lake County is 1% black
 
 
 [12]
 The court also noted that between 1975 and 1979, Local 496's membership grew from approximately 100 to over 500 members (400%), but that during that time, black membership increased only from 10 or 12 members to 18 members (less than 100%). Between April 1982 and February 1984, 42 new members were initiated into Local 496, none of whom was black. Between 1980 and 1985, the union accepted 54 new members, one of whom was black
 
 
 [13]
 While the court stated that the expert reports would not "control," it also acknowledged that it would consider the reports in concluding whether or not there was discrimination. During the trial, the court asked Dr. Pendleton questions indicating that it might be more appropriate to include only the east side of Cuyahoga County. As discussed below, this likely would result in a greater percentage of blacks in the relevant labor market
 
 
 [14]
 Local 496 asserts that instead of declaring "the four-county area" to be the relevant market, the court needed to identify further the interested and/or available applicants within those geographic boundaries. I disagree
 As an initial matter, I note that Local 496 spends a significant amount of time arguing that Dr. Pendleton's findings are "clearly erroneous" and/or legally insufficient, and that its expert's report was "superior." Contrary to Local 496's assertions, however, we review the court 's findings, not the expert's opinion for clear error. Thus, I construe Local 496's arguments directed toward the district court's findings.
 Citing Chicago Miniature Lamp Works, Local 496 argues that the court erroneously failed to factor commuting times into the relevant population determination. Chicago Miniature involved the hiring practices of a manufacturing company, located in an Hispanic and Asian neighborhood of Chicago, for entry-level positions requiring few skills and offering low pay that did not rise substantially over time. 947 F.2d at 294-95. The court stated: "The identification of a relevant labor market--the key issue in a class-based Title VII case--means not only identifying qualified potential applicants for the job at issue but also identifying interested potential applicants." Id. at 302 (emphasis in original). The court went on to hold that because low paying jobs are more likely to be filled by those living closer to the job (because the cost of a possible 1 1/2 hour commute cannot be justified), consideration of commuting time was especially important to the case before it. Id. The court also noted that the boundaries were arbitrarily drawn such that they did not include some areas just over 5 miles from the plant, but did include other areas as far as 20 miles away, id. at 302 n. 8, and that the district court had failed to consider that the company's lack of an English-fluency requirement meant that it would receive a disproportionately large number of applications from non-English speaking persons. Id. at 302-03.
 Chicago Miniature itself recognized that "a statistical model [in a discrimination case] need not be completely specified and some arguably relevant variables can be omitted in certain cases." Id. at 300. While it might have been helpful for the court to have explained its reasons for concluding that commuting time did not affect its relevant market definition, such explanation was not mandated in this case. In sharp contrast to the low-wage situation in Chicago Miniature, the record reflects that the jobs at Perry offered more than double the average wage available in other positions. Obviously, higher wages make jobs with longer commutes much more attractive. Moreover, under its own argument, Local 496 must acknowledge that including all of Cuyahoga County, as opposed to just the east side, works in its favor.
 Local 496 also asserts that the court would need somehow to factor into the calculation the fact that for proximity reasons, part of the relevant population residing in Cuyahoga County might join the two other local laborers unions instead of joining Local 496 and working at Perry. (Local 310 has approximately 1100 members, and Local 860 has approximately 850 members.) Local 496 has failed to cite, and I cannot find, any support for the assertion that to satisfy Wards Cove, the relevant population figures must factor in a deduction for persons with other job prospects. At least in the context of this case, I reject this contention. See Newark Branch, NAACP v. Town of Harrison, 940 F.2d 792, 800 (3d Cir.1991) (in assessing the district court's definition of the relevant labor market, noting: "Nothing in Wards Cove or other cases interpreting Title VII so much as suggests that available 'outside' job opportunities have any relevance whatever to the Title VII liability of a particular employer.").
 
 
 [15]
 The district court proceeded to find that the union's asserted business justification was "clearly a pretext," and that in any event, there was a less restrictive alternative. On appeal, Local 496 has not asserted that this finding was in error, instead addressing only the requirements of Plaintiffs' prima facie case
 
 
 [16]
 The Supreme Court has previously observed that Congress clearly limited an international union's liability for acts of its affiliates to situations where a common-law agency relationship existed. See Carbon Fuel Co. v. United Mine Workers, 444 U.S. 212, 216-18, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). Although Carbon Fuel involved the breach of a collective bargaining agreement by a local affiliate, the Court has also required the existence of an agency relationship to impose vicarious liability for discriminatory practices. See General Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 391-95, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982) (discussing 42 U.S.C.A. § 1981 liability of trade associations and employers for local union's discriminatory practices)
 In Berger, relying in part on Carbon Fuel and General Building Contractors, the D.C. Circuit explicitly held that common-law agency principles apply to unions and their internationals in the civil rights context. 843 F.2d at 1427-29. We think that Berger aptly ties together the existing case law and sets forth the correct approach.
 I am aware that in Myers v. Gilman Paper Corp., 544 F.2d 837 (5th Cir.1977), the Fifth Circuit stated that to hold an international union liable for the discrimination of a local affiliate, "[t]here must be a 'sufficient connection' between the labor organization and the discriminatory practice." Id. at 851. I agree with the D.C. Circuit, however, that Myers 's actual application of the "sufficient connection" test does not support using in the area of Title VII and § 1981 an agency standard less stringent than that required by common-law agency principles. See Berger, 843 F.2d at 1428. In Myers, the international union was liable because of the "close relationship" with its local under which the international provided "advisors" who helped negotiate the discriminatory provision and required that the local submit its contract to the international for approval. 544 F.2d at 851. In other words, the international "participated in" and "approved of" the discriminatory practice. Moreover, Myers predated both Carbon Fuel and General Building Contractors; thus, to the extent it permitted a lesser connection between the international union and its affiliate, Myers has been superceded.
 
 
 [17]
 In Carbon Fuel, the Court described the necessary agency relationship as requiring that the international union "instigated, supported, ratified, or encouraged" the local affiliate's conduct in question. 444 U.S. at 218. Somewhat differently, the Court in General Building Contractors stated: " 'Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " 458 U.S. at 392 (quoting Restatement (Second) of Agency § 1 (1958)). The Court particularly emphasized the idea of "control," noting that the "power to oppose" union discrimination is not tantamount to a "right to control" the union. Id. at 393. The Berger court's characterization of agency adequately accounts for these various definitions
 
 
 [18]
 In Goodman, the Supreme Court declined to reach the question of whether a trade union has an affirmative duty to oppose the racial discrimination of others (because the unions' practice of refusing to file any and all grievances presented by a black person on the ground that the employer would resent such grievances was an actionable violation in and of itself), but Justices Powell, Scalia, and O'Connor expressed their skepticism that such an affirmative duty could be imposed. 482 U.S. at 687-89
 Plaintiffs seek to distinguish the concurring opinion in Goodman, noting that it states that an affirmative duty to oppose "employer" discrimination would work a disruption in the basic policies of labor laws, whereas here, the discrimination is by a "local union," over which the international has a greater measure of control. I do not find this distinction to be of any import: federal law also protects the autonomy of local unions. Cf. 29 U.S.C.A. §§ 461-66 (West 1985 & Supp.1998) (regulating the suspension of local union autonomy).
 
 
 [19]
 Although not acknowledged by the district court, the evidence shows that in the 1984-85 time period, LIUNA, through Regional Representative Tom Arconti, did make some effort to investigate discrimination claims