NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0359n.06

No. 08-3438

**FILED**
**May 20, 2009**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

CHERYL CLEVENGER,

    Plaintiff,

        v.

DILLARD'S DEPARTMENT STORES, INC.;
MERCANTILE STORES PENSION PLAN;
MERCANTILE STORES PENSION COMMITTEE,

    Defendants/Third Party Plaintiffs - Appellants,

TOWERS, PERRIN, FORSTER & CROSBY, INC.,

    Third Party Defendant - Appellee.

On Appeal from the United
States District Court for the
Southern District of Ohio at
Cincinnati

_____/

**Before:**      **GUY, GILMAN, and COOK, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**    This appeal concerns only the third-party claims of defendants Dillard's Department Stores, Inc. (Dillard's), Mercantile Stores Pension Plan (Plan), and Mercantile Stores Pension Committee (Committee), against third-party defendant Towers, Perrin, Forster & Crosby, Inc. (Towers Perrin), an actuarial consulting firm involved in Dillard's termination of the over-funded pension plan after Dillard's acquisition of Mercantile Stores. The complaint, filed as a putative class action by Cheryl Clevenger, was settled for $35 million, and the third-party claims of the Plan and the

Committee were dismissed for lack of standing. Dillard's third-party claims, however, were tried over the course of an eight-day bench trial that resulted in a 100-page decision and entry of judgment in favor of Towers Perrin.

On appeal, Dillard's argues for a number of reasons that the district court erred in finding (1) that there was no contractual agreement to send out participant election packets by a date certain, and (2) that even if there was such a contract, Towers Perrin was not in breach and Dillard's waived any right to performance. The Plan and the Committee assert, without developing their arguments, that the district court erred in dismissing their claims against Towers Perrin. We affirm.

## I.

Dillard's, Inc., acquired another chain of stores called Mercantile Stores effective August 13, 1998. The Mercantile Stores Pension Plan (Plan) was over funded by $185 million, and Dillard's (the new plan sponsor) decided to terminate the Plan to create a reversion of the excess amount to Dillard's. When the termination was completed, a reversion of $80 million was apparently used to fund Dillard's future 401(k) employer contributions. The crux of the class action as well as the third-party complaint is that Dillard's wanted to maximize the amount of that reversionary surplus by paying out lump sum benefits using the 1998 Plan year interest rate of 6.33%, instead of the 1999 Plan year rate of 5.01%, because the higher rate would result in lower lump sum payments (*i.e.*, present value). The difference in the total distributions depending upon which interest rate was used was approximately $37 million.

On September 28, 1998, the Plan was terminated effective November 28, 1998. The termination notice was sent to the Pension Benefit Guaranty Corporation (PBGC) on November 23, 1998, and that triggered a 60-day review period during which the proceeds could not be distributed. This meant that even if the PBGC interposed no objections, the distributions could not be made before January 23, 1999—a week before the 1998 Plan year would end on January 30 or 31, 1999. Ultimately, the distributions were made after the end of the 1998 Plan year, but they were nonetheless calculated using the 1998 Plan year interest rate (which created the greater reversion to Dillard's). This was believed to be permissible pursuant to a newly adopted Plan Amendment, but it resulted in several complaints from participants—including the putative class action filed by Cheryl Clevenger in 2002.[1]

Towers Perrin, which had previously provided plan administration services to Mercantile Stores, was retained by Dillard's to calculate the lump sum distributions to be paid to the approximately 30,000 Plan participants and to provide administrative services, such as sending notices and election forms and processing distributions. Towers Perrin was not authorized to provide legal services, however, and Dillard's retained an ERISA attorney named Joseph Hurst who acted as a liaison between Dillard's and Towers Perrin.

There was evidence that Dillard's, in particular its CFO James Freeman, wanted the distributions to be made before the end of the 1998 Plan year. There was also evidence that Towers Perrin was concerned that this was not feasible given (1) the problems Towers Perrin anticipated having with the participant information (particularly, vested but deferred former

---

[1] The district court noted that, for reasons that were not clear from the record, the 1999 Plan year rate was used to calculate lump sum payments for 400 of the 30,000 plan participants.

employees) ("data problems"); and (2) the very short window between the end of the PBGC review period on January 23, 1999, and the end of the Plan year on January 30 or 31, 1999.[2]

On October 7, 1998, a meeting was held at Dillard's headquarters to discuss the plan termination and Towers Perrin's concern that it was highly unlikely that the distributions could be made before year end (although Freeman was in and out of the meeting and had little recollection of what was discussed). During that meeting, Hurst proposed that they could get around this problem—and still use the more favorable interest rate—by amending the Plan to fix the "Annuity Starting Date" at January 23, 1999, and then relying on "reasonable administrative delay" to justify the distributions made after year-end. The fact that this solution could invite litigation was discussed, but Dillard's decided to go forward. The Plan Amendment, executed on November 1, 1998, stated that "the Annuity Starting Date for all benefits paid on account of the plan's termination shall be January 23, 1999, regardless of whether actual payment is delayed for some reason." Towers Perrin proceeded to calculate lump sum payments using the 1998 Plan year interest rate, regardless of when Citibank, the plan trustee, would issue the payments.

A November 13, 1998, status report letter from Towers Perrin updated the schedule, represented that it was "on target" for all deliverables, and estimated its fees for the project to be in the $500,000 to $700,000 range. The list of services included: "Calculation of estimated accrued benefits and lump sum values for November 23 Notice of Plan Benefits"; "Calculation of final accrued benefits and lump sum values for December 18th package";

---

[2]Dillard's blamed Towers Perrin for not having cleaned up the data, and Towers Perrin blamed Dillard's for being unwilling to pay for it.

"Preparation and distribution of final election packages for December 18th mailing"; and

"Coordination with Trustee for distribution of Plan benefits." The attached schedule—which

Dillard's would later insist constituted a written contract promising both to send election

forms by December 18, 1998, and to make the distributions on January 22, 1999—included

in the "comments" column that the date for distributions: "Assumes no comments from

PBGC or *any other issues that delay the distribution.*" (Emphasis added.) At that time,

Towers Perrin reported that there were significant data problems, including that the first

mailing in October resulted in 5,000, or 1/6 of the total, being returned due to incorrect

addresses. Also, the November mailing of "estimated benefits" resulted in thousands of

calls. Towers Perrin blamed some of the delay on the decision of Dillard's to eliminate the

job of the one Mercantile employee who had been able to quickly respond to Towers Perrin's

inquires about employee data.

On January 13, 1999, Jay Popky, a Towers Perrin employee, sent Hurst a draft of

Towers Perrin did not mail the election forms by the December 18 date, but sent them

between late December 1998 and early January 1999. The December 18 status report letter

advised that Towers Perrin was receiving 200 to 300 calls per day about the distributions, and

that responding to the calls and researching employee data would likely delay final

distribution of benefits. A January 8, 1999 report letter stated that 5,000 election notices

were mailed the last week of December 1998, and that 6,000 would be mailed the week of

January 11, 1999, *making distribution by January 30 impossible* because participants had 30

days to make their election.

On January 13, 1999, Jay Popky, a Towers Perrin employee, sent Hurst a draft of

Q&As for participants that specifically stated that no payments would be distributed until late February. But Hurst said that he did not read it. That day, Popky also met with Dillard's treasurer and indicated that it was unlikely that payments would be made by January 29 and suggested that someone should talk to Freeman. The January 23 date came without comment from PBGC, but Citibank needed documentation from Dillard's before issuing the distributions. On January 26, Hurst emailed Towers Perrin and advised that Freeman insisted "in no uncertain terms" that he wanted checks to roll out starting on Friday, January 29. No distributions were made by then, however, and Towers Perrin notified Dillard's when the first payments went out in early February 1999. Dillard's did not object or claim breach at that time. It was not until later that year that a different Dillard's attorney relied on the delay in distributions as a basis for objecting to Towers Perrin's fees.

Clevenger's class action asserted various ERISA claims against Dillard's, the Plan, and the Committee (defendants), and the defendants brought third-party claims against Towers Perrin. The third-party claims included indemnification, breach of contract, negligence, malpractice, and negligent misrepresentation. Towers Perrin also asserted a counterclaim against Dillard's, and a fourth-party claim against Hurst's law firm. The fourth-party claim was dismissed for lack of privity between Towers Perrin and the law firm. After the third-party claims of the Plan and the Committee were dismissed for lack of standing, the district court conducted a bench trial on Dillard's third-party claims and entered judgment in favor of Towers Perrin. This appeal followed.

**II.**

## A.       Breach of Contract

Following a bench trial, we review questions of law *de novo* and findings of fact for clear error. *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 402 (6th Cir. 1999). This court must also give due regard for the trial judge's opportunity to judge the witness's credibility. FED. R. CIV. P. 52(a)(6).

Asserting legal error, Dillard's argues that the district court improperly relied on parol evidence to conclude that there was no contractual agreement to distribute payments by a date certain. Ohio's parol evidence rule prohibits a party from contradicting or supplementing a written fully integrated contract with extrinsic evidence of prior or contemporaneous agreements, whether oral or written. *See Ed Schory & Sons, Inc. v. Soc'y Nat'l Bank*, 75 Ohio St.3d 433 (Ohio 1996). Dillard's, however, has not attempted to show that the writings represented the complete terms of a fully integrated contract. The district court did not err by considering all the evidence in an effort to determine what were the terms of the parties' contract.

Dillard's claimed that Towers Perrin breached the terms of a contract originally made orally at the October 7, 1998 meeting and reduced to writing in the November 13, 1998 and December 19, 1998 letters when it failed to send election forms to participants by December 18, 1998, and by failing to cause distributions to be made by the end of the 1998 Plan year. The district court set forth the general principles of Ohio contract law, found that there was a contract for services, and concluded that Dillard's had performed by paying more that $1.5 million in fees (despite an intervening fee dispute). Critically, the district court also found,

however, that there was no meeting of the minds regarding Dillard's claim that Towers Perrin had promised to deliver by a date certain: *i.e.*, mailing of the election forms by December 18, 1998, and distribution of the payments either by January 22, 1999, or before the end of the 1998 Plan year.

In so finding, the district court rejected Dillard's claim that Towers Perrin was bound to perform by those dates as a consequence of written schedules found (1) in an agenda for the October 7 1998 meeting, and/or (2) the schedules attached to the November 13 and December 18, 1998 status report letters from Towers Perrin. The October 7 document was clearly an agenda, and the district court found that Towers Perrin was not retained until after that meeting. The two status report letters did have attached schedules with "due dates," but the district court made the factual finding that the schedules did not manifest an intention to be contractually bound to deliver on those dates. Although Dillard's argues that the district court erred by relying on the absence of a signature line for Dillard's to manifest its assent to the dates, it is evident that the district court's finding was more generally that there was no mutual agreement regarding performance by a date certain.

Dillard's argues that there was an oral adoption of the schedules as the parties' written agreement. The district court specifically found, however, that Towers Perrin made no oral representation that it would be bound by those dates. There was certainly evidence that, from the outset, Towers Perrin believed that the dates were unlikely to be met and, having conveyed that information to Dillard's, a Plan Amendment was adopted that the parties believed would resolve the dilemma of how to distribute the benefits using the 1998

Plan year interest rate. The district court also found poor communication between the parties, in particular because they used Hurst as a go-between, which meant that Dillard's continued to want the distributions to be made by year-end, while Towers Perrin believed that the distributions would not and did not need to be made within the 1998 Plan year.

Examining the schedules themselves, the district court found that, although the term "due date" was not ambiguous, the schedule noted that the Plan year ended January 30, 1998, but did not list that as any type of deadline. Rather, the schedules listed January 22, and January 23, 1999 as "due dates" for lump sum distributions. The district court found that:

> [I]f the schedule is to be interpreted as establishing a deadline for the distribution of lump sum payments, then the only reasonable interpretation is that the schedule imposes a deadline of January 23, 1999, not January 30, 1999, as Dillard's maintains. Although Dillard's argues that its intent was that all distributions were to be paid out by the end of the Plan year, this intent is not reflected in the schedule.
>
> . . . Dillard's does not claim that Towers Perrin breached the alleged contract by failing to make payments by the specified due date of January 23, 1999, and, in fact, it would have been virtually impossible to [do so] . . . [and the] evidence at trial demonstrated that it would not have been feasible for Towers Perrin to process the election forms and for Citibank to distribute the checks within this tight timeframe, even in the absence of any data or other issues that delayed the distributions.

Moreover, the district court found that even if there had been a contractual obligation to distribute by January 23, 1999, that obligation was conditional since the "comments" section of the schedule for lump sum distributions stated: "Assumes no comments from the PBGC or other issues that delay distribution." The district court found that the second clause was ambiguous. Although Dillard's believed that the clause referred to issues like comments from the PBGC, the district court noted that the clause did not follow an enumerated list of

items of similar type so as to invoke the rule of *ejusdem generis*. Also, the evidence showed that Towers Perrin understood it to include the data issues that the parties had discussed, including incorrect or missing addresses, birth dates, and dates of employment. The district court found that Dillard's had not proved that Towers Perrin breached the contract by failing to complete the lump sum payments by January 23, 1999.

Dillard's argues that it was reversible error for the district court to find no breach by Towers Perrin's failure to complete *any* distributions before the 1998 Plan year, when the district court also found that some distributions could have been made that could have reduced the loss to Dillard's. Although Dillard's points to what appears to be an inconsistency in the findings concerning whether distributions could have been made in the window between January 26 and January 29, the bottom line is that the district court found both that Towers Perrin had not promised that the distributions would be made before the Plan's year-end, and that the parties all believed that they could use the 1998 Plan year interest rate regardless of whether the distributions were completed before year-end.

Dillard's also appeals from the district court's alternative finding that even if there was a contractual obligation, Dillard's waived its right to timely performance.

## B.    Waiver

The party claiming waiver must prove a "clear, unequivocal, decisive act" showing waiver. *White Co. v. Canton Transp. Co.*, 131 Ohio St. 190, syll. para. 1 (1936). "Waiver may be expressed by words or conduct which makes a party's performance impossible, or which dispenses with complete performance at time when the obligor may fully perform."

*Sandler v. AII Acquisition Corp.*, 954 F.2d 382, 385 (6th Cir. 1992). "[M]ere silence will not amount to waiver where one is not bound to speak." *White*, 131 Ohio St. at 190. An implied waiver occurs when a party "has been prejudicially misled or lulled into believing strict compliance is not required." *Sandler*, 954 F.2d at 385. Finally, a "time is of the essence" provision may be waived "when the party to be benefitted 'does any act inconsistent with the supposition that he continues to hold the other party to his part of the agreement.'" *Id.* (citation omitted). The party's actions must "'evince in some unequivocal manner an intent to waive . . . .'" *Id.* (citation omitted). The district court found waiver, explaining:

> . . . Dillard's contends that the evidence demonstrates that it identified Towers Perrin's breaches, Towers Perrin wrongly advised it that administrative delay would be a defense, and it had no choice but to proceed with the termination of the Plan already in progress once Towers Perrin missed the distribution deadline, which Dillard's has construed as January 30, 1999. In fact, though, Dillard's never insisted that payments be completed by the "due date" of January 23, 1999 . . . , it led Towers Perrin to believe that payments could be made after that date (and even into the 1999 Plan year consistent with the parties' interpretation of the Plan Amendment establishing the annuity starting date), and it never informed Towers Perrin that it was in breach of the agreement but instead continued to approve authorizations for disbursements without protesting the alleged delay in the payments. By continuing to work with Towers Perrin to terminate the Plan and continuing to approve payments, Dillard's went beyond maintaining its silence in the face of Towers Perrin's alleged breach.
>
> In any event, Dillard's was not entitled to rely on Towers Perrin's advice as to use of an administrative delay theory. Towers Perrin was not authorized to provide legal advice to Dillard's, and Dillard's had retained its own legal counsel to advise it on legal matters pertaining to ERISA.

For these reasons, the district court found that Towers Perrin had proved waiver of any right to performance by a date certain.

On appeal, Dillard's argues that continuing to work with Towers Perrin without

protesting Towers Perrin's alleged breaches was insufficient to evince in some unequivocal way the intent to waive. Dillard's contends both that the district court's finding rests on nothing more than "mere silence" in the face of the breach, and that, in fact, Dillard's insisted that the checks start rolling out in Hurst's January 26, 1999 email to Popky. Dillard's also argues that the failure to respond to the revised Q&As sent to Hurst (advising participants that distributions would begin in late February) was immaterial because the Q&As only sought to limit telephone inquiries from Plan participants. The evidence showed, however, that Hurst simply did not read the attachment.

Keeping in mind the standard of review following a bench trial, having carefully reviewed the district court's written decision, and after considering the arguments presented on appeal, we affirm the district court's decision with respect to Dillard's breach of contract claim.

## C. Standing

We review *de novo* the district court's decision to enter summary judgment in favor of Towers Perrin on the third-party claims of the Plan and the Committee. The district court dismissed those claims for lack of standing, explaining that:

> Because the Plan was terminated prior to the Class Action Settlement Agreement, the now-defunct Plan has not shown that it suffered an injury that will be redressed by a favorable decision against Towers Perrin, even if the Plan somehow continues to serve as the vehicle for the distribution of lump sum payments to the Class members. The same is true of the Committee. Neither the Plan nor the Committee has alleged that it contributed to the Settlement payment, and neither has offered any evidence to show that it incurred legal fees in the defense of the Class Action lawsuit. Accordingly, both the Plan and the Committee have failed to carry their burden to establish standing to pursue their claims against Towers Perrin.

Asserting that this was error, the Plan states that the settlement "not only reduced the reversion to Dillard's as sponsor, but injured the Plan by increasing the distributions from the Plan to participants." The Committee states, without pointing to any evidence in the record, that "it suffered damages in the form of defense costs incurred in defending the underlying Clevenger action, all arising out of Towers Perrin's failure to cause distributions to be made during the 1990 Plan year." These claims are without development on appeal, and do not dispute the district court's determination that neither the Plan nor the Committee met its burden of demonstrating standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). This is insufficient to demonstrate error.

**AFFIRMED.**