NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0462n.06

Case No. 24-3347

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| LYNN DETILLION, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellant, | ) | Nov 21, 2024 |
| | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| OHIO DEPARTMENT OF | ) | THE SOUTHERN DISTRICT OF |
| REHABILITATION & CORRECTION; | ) | OHIO |
| OHIO CIVIL SERVICE EMPLOYEES | ) | |
| ASSOCATION, AFSCME LOCAL 11, | ) | |
| | ) | OPINION |
| Defendants-Appellees. | ) | |

Before: BATCHELDER, STRANCH, and READLER, Circuit Judges.

**CHAD A. READLER, Circuit Judge.** During her tenure as a prison guard, Lynn Detillion held watch over an inmate who committed suicide. Believing that the suicide was tied to Detillion's misconduct, her employer initially reassigned her and later terminated her employment. A second guard, Detillion's partner, was also terminated. The officers' union filed grievances for both. But it later withdrew Detillion's while pursuing her partner's, who was ultimately rehired. Detillion sued her employer and union, alleging she was mistreated before and during the grievance process. The district court granted summary judgment against her on all claims. We affirm.

I.

Inmate Ronnie Jones hanged himself in a cell block staffed by Detillion and her partner, Angelo Brodie. The next day, a prison lieutenant collected statements from inmates who witnessed the tragedy. The lieutenant learned two important things.

First, Detillion seemingly engaged in egregious misconduct. On the night of the incident, the lieutenant learned, Detillion locked Jones in a cell by himself and refused to let him speak with a mental health professional about a recent death in his family. When Jones threatened to kill himself, a friend asked to enter the cell to calm him down. Detillion called the friend a "f*g" who, she claimed, only wanted into the cell "so [they] could f*ck." Detillion had the friend removed from the block. Jones inquired about his friend, at which point Detillion "announced" to the cell block "that Jones said he was going to kill himself if they didn't move him to where his 'boyfriend' was" located. Detillion later found Jones with a noose and mocked him for not tying it correctly. She also joked that Jones did not "have the guts" to kill himself. Throughout the evening, Detillion "kept telling [Jones] to do it and calling him every name in the book."

Although Brodie was present for much of this, the inmates reported only two of his actions: early in the evening, he threatened to pepper spray Jones if he did not stop kicking his cell door, and later he refused one of Jones's requests to see a mental health counselor by telling him to wait until Detillion returned to the cell block. No inmate accused Brodie of antagonizing Jones as Detillion was alleged to have done repeatedly throughout the evening.

Second, multiple inmates then threatened Detillion, blaming her for the suicide. No inmate, however, made similar threats against Brodie. The lieutenant reported this information to his superiors in the Ohio Department of Rehabilitation and Corrections.

Concerned for Detillion's safety, Department officials transferred her to posts with no inmate contact while they formally investigated the suicide. Detillion asked to return to her previous post, to no avail. Brodie, meanwhile, remained on the cell block. Months later, the Department received the investigatory report. It concluded that Detillion and Brodie had each violated multiple policies, most notably by failing to supervise a suicidal inmate. A hearing officer reached the same conclusion. The Department then terminated Detillion and Brodie.

The officers' labor union filed grievances for both officers. The union later withdrew Detillion's grievance. It sent Brodie's claim to binding arbitration, at which point the Department agreed to rehire him.

Following the filing of multiple complaints, including with the Equal Employment Opportunity Commission (EEOC), Detillion sued the Department and the union, invoking both Ohio and federal law. To understand the genesis of those claims, it bears noting that Detillion is a white woman, whereas Brodie is a black man. Detillion claimed that the Department discriminated against her based on her sex and race, retaliated against her for filing complaints, and subjected her to a hostile work environment based on her sex. She likewise charged the union with sex and race discrimination as well as aiding and abetting the Department's actions. The district court granted summary judgment against Detillion on all claims. She appealed.

## II.

Start with some points shaping the scope of our consideration. One, we review the district court's grant of summary judgment de novo, construing the facts in the light most favorable to Detillion. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 251 (6th Cir. 2023). As the non-moving party, Detillion survives summary judgment if there is a genuine dispute of material fact or if the undisputed facts do not entitle the movants to judgment as a matter of law. *Levine v. DeJoy*, 64

F.4th 789, 796 (6th Cir. 2023). A genuine dispute requires "evidence on which the jury could reasonably find for" Detillion. *Id.* (quotation omitted). Two, we apply the same substantive analysis to Detillion's federal claims under Title VII, *see* 42 U.S.C. § 2000e, as we do to her Ohio discrimination claims, *see* Ohio Rev. Code Ann. § 4112.02 (West 2021). That is the case because Ohio courts interpret these state claims using federal precedent. *Hauser v. Dayton Police Dep't*, 17 N.E.3d 554, 558–59 (Ohio 2014).

A.1. Turn first to Detillion's discrimination and retaliation claims against the Department. To succeed, she must show that the Department took detrimental action against her because she is white, female, or had filed protected employment complaints. 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); § 4112.02(A), (I). Without any direct evidence of discrimination, we employ the three-step framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). Under this construct, Detillion must first establish a prima facie case of discrimination or retaliation. *Levine*, 64 F.4th at 797. If she does, then the burden shifts to the Department to offer a legitimate reason for its decisions. *Id.* In that case, Detillion must show that the Department's offered reasons are merely pretextual. *Id.* at 798.

We need not dwell on the first and second steps of the *McDonnell Douglas* framework. Even assuming Detillion can establish a prima facie case of discrimination or retaliation, the Department proffered legitimate, nondiscriminatory reasons for her reassignment, termination, and non-rehire. It transferred her initially for safety reasons. It maintained the transfer to investigate her alleged misconduct. It eventually fired her because the investigation and subsequent hearing each concluded that she violated multiple Department policies. And it refused to rehire her, unlike Brodie, because her grievance was withdrawn. So Detillion can prevail only if she can "produce sufficient evidence" from which a juror could "reasonably reject [these] explanation[s]" as mere

pretext for discrimination. *See Blount v. Stanley Eng'g Fastening*, 55 F.4th 504, 510 (6th Cir. 2022). That includes evidence showing that the asserted reasons had no basis in fact, did not actually motivate the Department's actions, or were insufficient to do so. *Id.* Detillion cannot show pretext using any of these theories.

a. Detillion has not raised a genuine issue of material fact as to whether the safety and misconduct concerns behind her reassignment were pretextual. As a starting point, she cannot show that these reasons had no basis in fact. To do so, she would need evidence "that the proffered bases for" her reassignment "never happened" and are "factually false." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (quotation omitted). And even if that were the case, the Department could still earn summary judgment if it "reasonably and honestly relie[d] on particularized facts" in reassigning Detillion. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 401 (6th Cir. 2009). It did. The lieutenant who investigated the matter learned that some inmates "were out to get" Detillion and that she was accused of acting reprehensibly in failing to prevent— and possibly causing—Jones's suicide. He reported this information to the warden, who later reassigned Detillion. From this record, the warden reasonably and honestly relied on particularized facts to conclude that Detillion was both in danger and accused of gross misconduct.

Likewise, Detillion fails to show that these reasons were not the basis for her reassignment. Suggesting otherwise, she argues that the Department's stated reasons changed over time. True, an employer can lose credibility and bolster an employee's pretext argument by changing the reasons it gives for acting. But that is so only if the new reasons contradict the old ones. *See Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890–91 (6th Cir. 2020). And here, the supposedly changing rationales—"safety," "active investigation," and "differences in allegations"—are consistent with each other and are supported by the record.

5

Nor can Detillion prove that the safety and misconduct rationales were insufficient to motivate her reassignment. Here, she needs evidence that a nonprotected employee committed "substantially identical conduct," yet was not reassigned. *See Chattmen v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012). Proving as much requires a "closer correlation" than does the "substantially similar conduct" showing at the prima facie case stage. *Miles*, 946 F.3d at 893–94. Detillion says that Brodie is a suitable comparator. But his conduct was not "substantially identical" to hers. She cannot point to any evidence that Brodie received any threats implicating his safety. And while he did engage in some purported misconduct, Department officials who reassigned Detillion did not discover the nature of his acts until many months after she was reassigned. Even then, the reported allegations against the two are dissimilar. For Detillion, the investigatory report concludes that "very clear" evidence "points to [her] laughing at, disrespecting, antagonizing, mocking, and urging inmate Jones to kill himself . . . even after he requested to see mental health" counselors. As to Brodie, meanwhile, the report alleges simply that he "was aware of [Detillion's] actions and also played a part in them"—that is, he "condoned" her conduct and "took no action to stop it." But there is no concrete allegation that Brodie antagonized Jones. In view of these dissimilarities, there is no Department employee with conduct substantially identical to Detillion's, dooming her effort to show pretext through a comparator.

b. Nor can Detillion show that the Department acted pretextually in firing her for violating its policies. The underlying investigatory report along with the hearing officer's conclusions gave the Department ample basis in "particularized facts" to conclude that Detillion violated Department policy. *See Chen*, 580 F.3d at 401. Detillion has presented no evidence that Department officials disbelieved these conclusions or that her termination was not or could not

have been motivated by her policy violations. So she cannot show the Department's reasons were pretext.

c. Finally, Detillion cannot show that the Department's fear of liability was pretext for discriminating in not rehiring her yet rehiring Brodie. First, she admits to the factual basis behind this fear—that the union advanced Brodie's grievance while dismissing hers. Second, she presents no evidence that the Department's fear of liability did not actually motivate its decision. And third, she cannot point to a nonprotected employee in a "substantially identical" position. *Miles*, 946 F.3d at 894. Brodie, her only identified comparator with respect to the Department's rehiring decision, is of no use to her because he, unlike her, had a live grievance and a different factual record.

d. Resisting these conclusions, Detillion argues that we have set the hurdle too low for the Department in articulating "legitimate reasons" for her discipline because she is not an "at-will" employee. This point mixes fields of law. Contract law might bar Detillion's firing for anything less than "just cause." But a "legitimate reason" in a case under *McDonnell Douglas* is any reason but discrimination or retaliation. *Miles*, 946 F.3d at 886. In other words, even if the Department's reasons appear at odds with Detillion's contract, they are "legitimate" for our purposes because they are nondiscriminatory and nonretaliatory.

Detillion next faults the district court for considering the inmates' witness statements as evidence that she had committed the alleged misconduct. To Detillion's mind, those statements reflect hearsay evidence that may not be considered at summary judgment. *Hoover v. Walsh*, 682 F.3d 481, 491 n.34 (6th Cir. 2012). Those out-of-court statements are hearsay, however, only if they are offered for the truth of the matter asserted. *Id.* And here, the district court merely considered the statements (as we have), "not to prove their truth, but to demonstrate the state of

7

mind and motive of" the Department officials who disciplined Detillion. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598 (6th Cir. 2007) (cleaned up).

2. Detillion also sued the Department for sex-based harassment, invoking a "hostile work environment" theory. *See* § 2000e-2(a)(1); § 4112.02(A). To prevail, Detillion must prove that the alleged harassment was "based on sex." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006). Her claim fails at the outset, because she cannot do this.

Detillion's alleged harassment is actionable under Title VII only if she presents evidence that it grew from "discriminatory animus against women." *Schlosser v. VRHabilis, LLC*, 113 F.4th 674, 684–85 (6th Cir. 2024). She has not done so. She makes just one argument to this end: she was reassigned to a post with hostile conditions, while Brodie, a male, was not. In that respect, Brodie and Detillion were treated unequally, but Detillion cannot show that anti-female animus motivated that treatment. As noted above, the Department offered multiple reasons for the varying treatment, in particular, the threats against Detillion and the graver allegations she faced. On this record, no reasonable juror could conclude that sex—as opposed to safety, discipline, or any other reason—motivated the different treatment.

B.1. We turn next to Detillion's claims against the union. She sued the union in its representative capacity for discriminating against her in three ways. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 667 (1987); § 2000e-2(c)(1); § 4112.02(C).

a. First, Detillion claims that the union discriminated against her by refusing to file grievances on her behalf from December 2019 to September 2020. To be eligible to sue for those acts, Detillion needed to file a complaint with the EEOC within 300 days of the end date of the unlawful conduct. *See* 42 U.S.C. § 2000e-5(e)(1); *Nat'l R.R. Passenger Corp. v. Morgan*, 536

U.S. 101, 110–13 (2002). Instead, she waited until September 18, 2021, to file, outside the 300-day window. Thus, her claim is time-barred.

b. Next, Detillion claims that the union discriminated by using an incorrect hire date when deciding whether to arbitrate her grievance. Again relying on the *McDonnell Douglas* framework, *see Alexander v. Loc. 496, Laborers' Int'l Union*, 177 F.3d 394, 402 (6th Cir. 1999), Detillion again falters at the pretext step. The union used a hire date of 2018, rather than 2015, in evaluating Detillion's grievance. Fair enough. Yet it also offered a legitimate, nondiscriminatory reason for using this date—typographical error. Detillion seems to concede that this incorrect date arose from a "typo." At any rate, she failed to produce evidence from which a reasonable juror could reject this explanation and instead conclude the union inserted a false date in an intentional ploy to discriminate.

c. Last, Detillion claims that the union discriminated by withdrawing her discharge grievance while advancing Brodie's to arbitration. This claim too must navigate *McDonnell Douglas*, *see Alexander*, 177 F.3d at 402, and it too sinks on the rocks of pretext, obviating any need for us to evaluate the prima facie case. According to the union, it withdrew Detillion's grievance due to the many factors that weighed against her likelihood of success, including her lack of seniority, "blatant" violation of policy, disciplinary record, and reassignment history. So Detillion must show that this explanation amounts to pretext.

She has not. First, the union's evaluation is based in fact. The staff recommendation to withdraw Detillion's grievance stated, "I do not believe that I can convince an arbitrator to bring her back to work." The staffer likewise testified at her deposition about the reasons she believed Detillion's case would fail at arbitration. Detillion admits to almost every fact the union cites in support, including her tenure, her violation of policy by failing to observe the suicidal inmate, her

9

previous discipline, and her reassignment. So she cannot show that the union's dim view of her chances was factually baseless.

Second, Detillion has not raised a genuine issue of material fact as to whether the union's evaluation actually motivated its decision. To her telling, some of the underlying justifications for dismissing her grievance were "conjured up" after the fact—specifically her prior discipline and her failure to reach eight years of seniority (which, according to some union officials' deposition testimony, was a crucial threshold). True, the staffer who recommended dismissal did not explicitly cite these reasons. But that staffer did note Brodie's clean disciplinary record and his ten-year tenure when she simultaneously recommended arbitration for his grievance. So these considerations were not fabricated during litigation. And although the first reference to an eight-year threshold is in deposition testimony, this notion does not "conflict with" the earlier reference to Brodie's ten years as significant. *Miles*, 946 F.3d at 891. So there is no inconsistency here that would support a finding of pretext.

Third, we see no pretext in the fact that, to Detillion's mind at least, Brodie committed the same misconduct as she yet had his grievance pursued to arbitration. To prevail, Detillion must show she and Brodie had "substantially identical" cases against the Department that the union nonetheless prosecuted differently. *See id.* at 893. Of course, because the underlying disciplinary decisions lie at the heart of each grievance, this argument fails from the start unless we accept the strained assumption that the officers engaged in "substantially identical" conduct before the suicide. But even if we accept that assumption, Detillion acknowledges multiple other significant differences between her case and Brodie's, including his clean disciplinary record, his five-year-longer tenure, and his continued inmate-contact assignment.

Differences in disciplinary history alone can defeat a claim that two employees are similarly situated in this context. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016). Prior discipline can be "a major, if not the most important, factor" in assessing similarity. *Stotts v. Memphis Fire Dep't*, 858 F.2d 289, 299 (6th Cir. 1988) (quotation omitted). Brodie's clean record thus could have fairly motivated the union to grieve his complaint differently from Detillion's.

So too as to Brodie's relatively wider experience. "Differences in experience" may help "establish that [two employees] are not similarly situated." *Tennial*, 840 F.3d at 304. So may differences in "mitigating circumstances." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). As noted above, union officials testified that arbitrators consider seniority a mitigating factor once an employee has reached eight to ten years of service. Detillion produced no evidence to contest this assessment. It follows that Brodie's ten-year tenure, and its associated mitigating consequences, also could have permissibly motivated the union to arbitrate his grievance.

Finally, the union demonstrated that Brodie's non-reassignment could have motivated it to arbitrate his grievance. A union staffer testified that by failing to reassign Brodie for several months, the Department essentially conceded that he was not a "safety and security" risk. Due to this weakness in the Department's case, the staffer believed she could persuade a neutral arbitrator to rehire Brodie, unlike Detillion. Detillion presents nothing to contradict this testimony.

Detillion's pretext argument faces yet another obstacle. The Department officials who rehired Brodie identified these same reasons—relative differences in seniority, discipline, and reassignment—to justify that decision, even naming the non-reassignment "a weakness in the employer's case." That the Department and the union viewed the record in such a similar light is

further evidence that the union was not acting in pretextual ways by not arbitrating Detillion's claims.

2.  Detillion also sued the union for aiding and abetting the Department's discrimination. *See* § 4112.02(J).  The district court concluded that this claim depended on Detillion's having another valid, underlying state law claim.  Detillion does not argue otherwise.  Because we agree that her other claims fail, so too does this tag-along claim.

*     *     *     *     *

We affirm the judgment of the district court.